ON MOTION FOR REHEARING
 

 LEWIS, J.
 

 We deny Appellants’ motion for rehearing. On our own motion, we withdraw our previous opinion and substitute the following for it.
 

 This appeal arises from a final summary judgment issued in favor of Arrowood Indemnity Co. f/k/a Royal Indemnity Co. (“Arrowood”) against Acosta, Inc. and Acosta Sales, LLC (collectively “Acosta”). In the order granting Arrowood’s motion for summary judgment, the trial court held that Arrowood, a liability insurer for Acosta, properly denied coverage for a lawsuit (“the underlying suit”) brought against Acosta by the Trustee of the Creditors’ Trust of Marketing Specialists (“the Creditors’ Trust”). In the same order, the trial court granted partial summary judgment for National Union Fire Insurance Co. (“National Union”), another liability insurer for Acosta. Acosta argued below, as it does here, that National Union and Arro-wood were obligated to indemnify it in the underlying suit. The trial court determined that National Union and Arrowood properly denied coverage under a “prior litigation” exclusion due to the relationship between the underlying suit and a suit brought by Marketing Specialists Sales Co. (“Marketing Specialists”) against Acosta in 2001 (“the turnover suit”). Both Arrowood and National Union defend that decision in this appeal.
 
 [1]
 
 For the reasons explained below, we agree with the trial court’s decision, and accordingly, we affirm.
 

 I. Factual and Procedural Background
 

 A. The. Policies
 

 There are two policies at issue in this case: a Directors, Officers and Private Company Liability Insurance Policy issued to Acosta by National Union (“the National Union Policy”); and an Excess Directors and Officers Liability and Company Reimbursement Coverage Policy issued to Acosta by Arrowood (“the Arrowood Policy”). The effective period of the National Union Policy was November 1, 2002, to November 1, 2003. The Arrowood Policy provided for liability coverage in excess of the limits of the National Union Policy, and by its terms, it was subject to the same warranties, terms, conditions, and exclusions as the National Union Policy.
 

 The prior litigation exclusion of the National Union Policy (“Exclusion '4(e)”), which is incorporated by reference into the Arrowood Policy,
 
 [2]
 
 provides as follows:
 

 
 *568
 
 The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:
 

 [[Image here]]
 

 (e) alleging, arising out of, based upon[,] or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation!;.]
 

 The “Continuity Date” was November 1, 2001.
 

 B. The Turnover Suit
 

 On June 26, 2001, a few months before the November 2001 continuity date, Marketing Specialists filed a Complaint for Turnover and Injunctive Relief against Acosta
 
 [3]
 
 in a United States Bankruptcy Court. In the complaint, Marketing Specialists identified itself as the debtor and debtor-in-possession in Chapter 11 proceedings that had been initiated on May 24, 2001.
 

 At that time, Marketing Specialists and Acosta were competitors in the food brokerage industry. After Marketing Specialists filed for bankruptcy, it attempted to negotiate a sale of its business to Acosta. However, Acosta would not agree to buy the business because, as Marketing Specialists alleged in the turnover complaint, Acosta believed “it would ultimately get the business anyway.” As a result of the negotiations with Marketing Specialists, Acosta agreed to a transition agreement under which it would enter into new broker agreements with certain of Marketing Specialists’ clients, commit to fund a portion of the back pay Marketing Specialists owed its employees, and pay for “its use of any assets of Marketing Specialists,” as it was phrased in the turnover complaint.
 

 Based on this agreement, on May 28, 2001, Marketing Specialists executed an interim agreement with Acosta, subject to execution of a final agreement, board approval, and approval by the bankruptcy court. The agreement was memorialized on a document the parties refer to as the “Term Sheet.” Marketing Specialists filed a motion to have the Term Sheet approved, but it withdrew that motion on June 7, 2001. After the motion was withdrawn, Acosta hired approximately 1,800 of Marketing Specialists’ former employees and entered into agreements with certain clients Marketing Specialists had represented. In the two weeks that followed, Marketing Specialists tried to determine what, if any, assets Acosta would be interested in acquiring.
 

 During the same time period, Marketing Specialists proceeded to close offices across the country. In the turnover complaint, Marketing Specialists made the following allegations about its office-closure procedures:
 

 In connection with these closures, Marketing Specialists has discovered a number of incidents involving employees of Acosta wrongfully removing files and equipment from Marketing Specialists’ offices. In particular, on June 13, 2001 at approximately 5:00 p.m., an Acosta
 
 *569
 
 van took an entire load of files, copy paper and a shelf unit from the Seattle Office. Marketing Specialists is now missing 25 file cabinets filled with files, 10 laptops, 3 to 5 monitors, and 2 printers from that office. In addition, last week Acosta employees removed all of the files from Marketing Specialists’ Atlanta offices and placed them in Acosta’s Marietta office. In Dallas, Acosta employees have also loaded up and taken away approximately ten boxes of files from the Marketing Specialists’ offices ....
 

 ... In addition, virtually all of the Journadas (in excess of 2,000) and laptops have been removed by former employees, many of which have gone to work for Acosta.
 

 Marketing Specialists further alleged that Acosta employees had filed change of address forms with the United States Postal Service to have Marketing Specialists’ mail, including checks from clients, sent to Acosta offices. The complaint referenced one form in particular, which was dated June 13, 2001.
 

 Based on the events detailed above, Marketing Specialists set forth three causes of action: one for injunctive relief; one for a temporary restraining order; and one for turnover. In count one, Marketing Specialists alleged that the “files, equipment, mail[,] and other personal property of Marketing Specialists” were “necessary to the successful reorganization or liquidation of the estate.” It further alleged that “[t]he property rights involved [were] unique and irreplaceable” and that Acosta had no legal interest in Marketing Specialists’ property. Marketing Specialists requested that the court enjoin “Acosta ... from taking any action to seize, possess, hold, control, assign, transfer, sell[,] or in any way whatsoever affect the interests of Marketing Specialists in and to its property, including, but not limited to, its equipment, computers, files, records, mail[,] and checks.” In count two, Marketing Specialists requested a “temporary restraining order to prevent the immediate and irreparable injury described above and the consequences to the Debtor’s estate flowing therefrom.” In count three, Marketing Specialists requested “the immediate turnover of all property of Marketing Specialists in the possession of Acosta, its affiliates, shareholders, directors, officers, employees[,] and agents.”
 

 The turnover suit was resolved by agreement of the parties without any formal adjudication. At a hearing in the turnover suit held on July 31, 2001, the bankruptcy judge found no evidence to suggest any wrongdoing on Acosta’s part.
 

 C. The Underlying Suit
 

 In May 2003, the Creditors’ Trust filed the underlying suit, and it named Acosta as a defendant in April 2004. After several amendments, the complaint in the underlying suit asserted twenty-seven claims, fifteen of which were against Acosta.
 

 In the introductory allegations of the complaint, the Creditors’ Trust asserted that Acosta had “violated automatic stay provisions after Marketing Specialists filed for bankruptcy protection and provided financial and other forms of compensation to encourage and assist the misappropriation of Marketing Specialists’ intangible property by its former employees.” It further alleged that Acosta and other “Competitor Defendants” were unjustly enriched by the transfer of a substantial portion of Marketing Specialists’ business without consideration. According to the complaint in the underlying suit, Acosta and other competitors had worked with former executives of Marketing Specialists to achieve such transfers from May 22, 2001, through June 1, 2001, and beyond. The Creditors’ Trust alleged that with the help of former Mar
 
 *570
 
 keting Specialists executives, some of whom were hired by Acosta within days of Marketing Specialists’ filing for bankruptcy, Acosta hired 1,781 of Marketing Specialists’ employees and acquired the accounts associated with these employees— all without paying any consideration to Marketing Specialists.
 

 The operative complaint in the underlying suit discussed the May 28, 2001 Term Sheet arid the related “Proposed Interim Transition Agreement,” alleging that the agreements memorialized in these documents had resulted from the negligence and disloyalty of certain Marketing Specialists executives. The Creditors’ Trust alleged that this agreement provided for the transfer of all of Marketing Specialists’ business to Acosta and allowed Acosta full access to and use of Marketing Specialists’ offices, documents, and databases for sixty days. Based on the Term Sheet, the Creditors’ Trust alleged that Marketing Specialists’ executives had “invited its strongest competitor to loot the Estate of its client relationships, goodwill[,] and other proprietary intangible assets.” The Creditors’ Trust claimed that Acosta had suborned this disloyalty and discussed the desirable salary and benefits packages provided to the Marketing Specialists former executives who came to work for Acosta.
 

 The Creditors’ Trust explained that one of Marketing Specialists’ former directors, “with the active assistance of Marketing Specialists’ ex-employees, accessed the Marketing Specialists computer system for various computer files and databases and provided them to Acosta for its commercial advantage.” It then alleged that Acosta had used Marketing Specialists’ proprietary information to assemble a database of important Marketing Specialists customers, the customers’ personnel, the “key Marketing - Specialists personnel,” and Marketing Specialists’ annual revenue from each customer. It further alleged that this information was critical to Acosta’s success in inducing many of Marketing Specialists’ largest 200 customers to sign temporary, interim brokerage agreements within seventy-two hours of the execution of the Term Sheet and many of its largest 1,000 customers within one week.
 

 The Creditors’ Trust alleged that “Acosta’s looting of Marketing Specialists’ Proprietary Property” included the use of Marketing Specialists’ “proprietary order entry system until June 18 or June 14, 2001” and “[t]he pursuit by Acosta employees and executives of various forms of ‘data dumps’ from the Marketing Specialists computer system, laptop computers and other computer devices.” It further alleged that, to exploit Marketing Specialists’ intangible assets through its agents, Acosta’s representatives obtained “repeated unauthorized access to Marketing Specialists’ protected computers.” The Creditors’ Trust alleged that such access occurred specifically on June 4, 2001, and after June 8, 2001.
 

 The Creditors’ Trust further alleged that a hearing had been scheduled on June 7, 2001, for the bankruptcy court to consider the motion to approve the Term Sheet and that, “[bjelying any pretext of good faith, the executives of Acosta had made no effort to finalize or detail the Proposed Interim Transition Agreement as specified in the Term Sheet.” It further alleged that, at 7:00 a.m. on the morning of the scheduled hearing, a meeting had taken place between bankruptcy counsel for Marketing Specialists, some directors of Marketing Specialists, key executives of Acosta, and Acosta’s counsel. At this meeting, according to the Creditors’ Trust, the two companies’ representatives agreed that the petition was unlikely to be approved and that there was no need for
 
 *571
 
 such approval in any event “because Acosta had already obtained the transition it sought.” It then, alleged that, even after one of Marketing Specialists’ former executives was advised that removal of Marketing Specialists’ documents and files violated the Bankruptcy Code, he instructed the “new Acosta employees” to make copies of all files on their laptops and other computers belonging to Marketing Specialists.
 

 The Creditors’ Trust went on to allege that, “[w]hile the actual number of documents and files removed is unknown, it is known that Acosta returned more than 1,000 boxes of documents.” The Creditors’ Trust also mentioned Acosta employees’ attempts “to have ongoing access to the mail addressed to Marketing Specialists even after - all Acosta personnel left the Marketing Specialists regional offices,” through “at least seven or eight” instances of Acosta personnel’s filing improper change of address forms with the U.S. Postal Service.
 

 Based on the allegations reproduced above and others, the Creditors’ Trust asserted the following causes of action against Acosta: Computer Fraud and Abuse; Trademark Violation and Dilution; Breach of Trust Fund Duties by Marketing Specialists’ Directors and Officers; Breach of Fiduciary Duties by Marketing Specialists’ Directors and Officers; Breach of Fiduciary Duties by Marketing Specialists’ Employees and Competitor Defendants; Misappropriation of Trade Secrets; Common Law Misappropriation; Conversion of Office Equipment and Intangible Assets; Violation of the Texas Theft Liability Act; Tortious Interference with Business Relationships; Fraudulent Concealment; Conspiracy; Avoidance of Post-Petition Transaction; Violation of Automatic Stay. Based on these causes of action, the Creditors’ Trust also sought exemplary damages and attorneys’ fees, setting these: requests forth as separate claims. These causes of action were asserted based on Acosta’s direct liability and its vicarious liability for the actions taken by the former Marketing Specialists executives it hired.
 

 All of the background allegations recited above were incorporated into each cause of action. Each cause of action was also based on additional, more specific allegations. Some of these causes of action were asserted against additional defendants who are not parties to this appeal. However, as concerned Acosta, all of the allegations related to actions taken - by Acosta and/or the former Marketing Specialists executives Acosta had hired during May and June of 2001. Each cause of action involved one or more of the following allegations, generally stated: Acosta used Marketing Specialists’ tangible property, including files, computers, and other office equipment; Acosta obtained trade secrets and other intangible property; through misappropriation by former Marketing Specialists’ employees, suborned by Acosta, Acosta obtained Marketing Specialists’ contracts, books of business, retail relationships, proprietary property, and other assets; through the use of this property and misrepresentations to the industry regarding Marketing Specialists’ relationship with Acosta, Acosta was able to obtain large accounts and clients; these actions were facilitated by the Term Sheet; through the Term Sheet, Acosta and former Marketing Specialists executives subverted bankruptcy protections; and Acosta and former Marketing Specialists employees fraudulently concealed information from the bankruptcy court when Marketing Specialists withdrew the motion to have the Term Sheet approved without informing the bankruptcy court that the transition sought to be obtained through the Term Sheet had already been substan
 
 *572
 
 tially completed and would continue to occur without approval of the Term Sheet.
 

 Acosta sought coverage for the underlying suit from National Union and Arro-wood. After National Union and Arro-wood refused to provide coverage, Acosta defended itself in the underlying suit and ultimately settled it.
 

 D. Summary Judgment in the Instant Case
 

 After settling the underlying suit, Acosta initiated the instant action seeking, among other things, to recover the costs it incurred in defending itself in and settling the underlying suit. When National Union and Arrowood filed motions for summary judgment, the trial court was called upon to decide whether the turnover suit and the underlying suit were sufficiently related to justify the denial of coverage pursuant to Exclusion 4(e). The insurers argued that resolution of the issue depended only on a comparison of the complaints, while Acosta argued that the relationship between the two suits could not be understood without consideration of evidence and the resolution of factual issues. Specifically, Acosta argued that it was necessary for the court “to look at the underlying facts and circumstances, what the wrongful acts were, [and] what the parties were going to settle.” It also requested that the trial court review deposition testimony of attorneys involved in both the underlying suit and turnover suit. Acosta claimed that this testimony would show that the turnover suit was narrowly focused on the return of physical property and that it did not involve Marketing Specialists’ goodwill or any claims of conspiracy or breaches of fiduciary duties. Further, Acosta claimed that the evidence would show that the turnover suit did not concern any wrongdoing on its part and that the underlying suit did not include any damages models related to the physical property at issue in the turnover suit.
 

 Acosta further argued that the trial court needed to compare each count asserted im the underlying suit to the turnover suit and make independent determinations as to the applicability of the prior litigation exclusions for each count. In contrast, the insurers argued that the applicability of the prior litigation exclusions should be determined based on a broader comparison of the two complaints.
 

 The trial court did not agree with Acosta that this evidence created a genuine issue of material fact. Instead, it agreed with the insurers that the issues could be resolved by consideration of the complaints alone. In its well-reasoned order, the trial court made the following observations about the two suits:
 

 This case presents a number of issues primary [sic] pertaining to the exclusions in paragraph 4(e) in the National Union insurance policies regarding “pri- or litigation” or “related wrongful act” clauses. The policy issued by National Union is a claims made policy. These polices offer coverage for claims filed during the time when the policy is in effect[;] however[,] the exclusions protect the insurers from being “sandbagged” when the insured was aware of pending claims likely to be filed or as a result of prior litigation, [citation omitted].
 

 Both the prior litigation (Turnover Suit) and the underlying litigation (Creditors Suit) pertain to the events that transpired during the brief period in May and June, 2001, in which the “Term Sheet” was in effect. While the complaints are different in the nature and number of counts and include some different parties, the events complained of all relate to the acts occurring during the operation of the “Term Sheet.”
 
 *573
 
 Acosta would not have had access to the proprietary materials belonging Marketing Specialists but for the agreements contained within the “Term Sheet.”
 

 Surely it cannot be stated that the acts alleged in the Turnover suit and underlying suit are unrelated....
 

 A review of the two lawsuits is informative as to deciding the issue
 
 sub judi-ce.
 
 [citation omitted]. From reviewing paragraphs 114 through paragraphs 130 and beyond of the Fourth Amended Original Complaint, it is apparent that all the wrongful acts alleged to have been committed by Acosta were during the time of the operation of the “Term Sheet.” While the complaint in the Turnover Suit is not as lengthy or creative in its prose or number of counts, the events complained of are all related to the same events and time period. It is clear from the review of the complaints the same type of wrongdoing was involved. Most all of the factual accusations in the Turnover complaint are repeated in the underlying complaint. In essence, it had to be because that was the only time in which Acosta had access and opportunity to commit the acts alleged.
 

 Observing that the acts alleged in the underlying complaint and the turnover complaint were “tied together because the course of conduct occurred in a very limited time frame,” the court held that the “prior litigation” and “related wrongful acts” exclusions in the policies barred coverage. Accordingly, it granted summary judgment for both National Union and Ar-rowood. After the trial court entered final judgment for Arrowood, Acosta sought review of this ruling.
 

 II. Analysis
 

 A trial court’s ruling on summary judgment is subject to de novo review.
 
 Castleberry v. Edward M. Chadbourne, Inc.,
 
 810 So.2d 1028, 1029 (Fla. 1st DCA 2002). Summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment upon application of the law to the undisputed material facts.
 
 See Virginia Ins. Reciprocal v. Walker,
 
 765 So.2d 229, 231 (Fla. 1st DCA 2000). In determining whether there is a disputed issue of material fact, courts must draw all reasonable inferences in favor of the party opposing summary judgment.
 
 Johnson v. Circle K Corp.,
 
 734 So.2d 536, 536-37 (Fla. 1st DCA 1999). However, where summary judgment turns on a pure question of law, such as the interpretation of an unambiguous contract provision, there are no relevant factual disputes.
 
 See Fernandez v. Homestar at Miller Cove, Inc.,
 
 935 So.2d 547, 550 (Fla. 3d DCA 2006).
 

 The issue on appeal requires interpretation of insurance policies. Several general principles are relevant to our consideration of this issue. First, interpretation of insurance policies is guided by the “plain meaning” of the language used in the policies.
 
 Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,
 
 913 So.2d 528, 532 (Fla.2005). Second, any ambiguities in the policies are “construed against the insurer and in favor of coverage.”
 
 Id.
 
 However, the Florida Supreme Court has emphasized that “[although ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous.”
 
 Id.
 
 Third, courts are not to “rewrite” insurance contracts and should bear in mind that “if a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision.”
 
 Id.
 
 (citation omitted). Finally, although case law may generally be informative for determination of a coverage issue, “the language of the
 
 *574
 
 policy is the most important factor” in such a determination.
 
 See Taurus,
 
 913 So.2d at 537.
 

 Here, the trial court held as a matter of law that the prior litigation exclusion applied to the underlying suit because of its relationship with the turnover suit. On appeal, Acosta argues that the applicability of the prior litigation exclusion cannot be determined without considering evidence outside the two complaints. In the alternative, Acosta argues that, even assuming a proper decision could be made based on the complaints alone, when each cause of action set forth in the underlying suit is separately compared with the turnover suit, at least some of those causes of action fall outside the ambit of the prior litigation exclusion. We disagree and will address each of Acosta’s arguments in turn.
 

 First, we consider whether it was necessary to
 
 go
 
 outside the complaints to decide the applicability of the prior litigation exclusion. A review of the plain language of Exclusion 4(e) reveals that there is no absolute requirement that a court consider evidence to determine whether it applies. However, the policy language also does not foreclose consideration of evidence. Accordingly, we look to case law to determine the circumstances under which a court must consider evidence to determine the applicability of a prior litigation exclusion.
 

 Acosta argues that this matter should be resolved by reference to the following general principle:
 

 An insurer’s duty to defend is broader than the insurer’s duty to indemnify. The duty to defend is determined solely by the allegations in the complaint, which must set forth facts that bring the case within the coverage of the policy. Meanwhile, the duty to indemnify is determined by the facts adduced at trial or during discovery.
 

 Farrer v. U.S. Fid. & Guar. Co.,
 
 809 So.2d 85, 88 (Fla. 4th DCA 2002) (internal citations omitted). Acosta contends that because the duty to indemnify, not the duty to defend, is at issue, it was improper for the trial court to enter summary judgment without considering whether the evidence Acosta could provide would create a genuine issue of material fact. In response, National Union and Arrowood emphasize that the duty to indemnify “cannot exist if there is no duty to defend,”
 
 see WellCare of Fla., Inc. v. Am. Int’l Specialty Lines Ins. Co.,
 
 16 So.3d 904, 906 (Fla. 2d DCA 2009), and they contend that the pleadings the trial court considered illustrate the lack of a duty to defend.
 

 Indeed, in
 
 WellCare of Florida, Inc. v. American International Specialty Lines Insurance Co.,
 
 the court noted that whether an insurer owed a duty to defend, thus opening the door to a potential duty to indemnify, depended on “whether the allegations in the ... complaint [brought] the action within the scope of coverage.”
 
 Id.
 
 The propriety of considering only the allegations of the complaint has also been recognized in the context of a policy exclusion.
 
 See Castillo v. State Farm Fla. Ins. Co.,
 
 971 So.2d 820, 824 (Fla. 3d DCA 2007). For example, in
 
 Castillo v. State Farm,
 
 the court stated, “[W]hen an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation.”
 
 Id.
 
 Thus, although the burden to demonstrate the application of a policy exclusion based on the allegations of a complaint alone may be heavy (depending, of course, on the language of the exclusion), it may be carried.
 
 See id.
 

 Our research has revealed no Florida case addressing how a trial court must handle an assertion on summary judgment
 
 *575
 
 that a prior litigation exclusion eliminates an insurer’s duty to defend. While the general principle that the duty to defend must be decided based on the complaint alone is relevant to our inquiry, it does not end our analysis because here, unlike in
 
 WellCare
 
 or
 
 Castillo,
 
 the trial court did consider evidence other than the complaint: specifically, it considered the complaint from the prior litigation. Consideration of the prior complaint was entirely proper, however, because its existence and authenticity was undisputed, and the general standard governing summary judgment allows a trial court to decide a case where the undisputed facts show that a party is entitled to judgment as a matter of law.
 
 See Virginia Ins. Reciprocal v. Walker,
 
 765 So.2d 229, 231 (Fla. 1st DCA 2000). Our inquiry is whether the trial court should have viewed Acosta’s evidence regarding the subject matter of the turnover suit as creating a genuine issue of material fact. We have found no Florida case directly on point.
 

 National Union and Arrowood have identified out-of-state cases that consider the application of prior litigation exclusions based only on the allegations of the complaints in the suit for which coverage is sought and the prior suit the insurers claim is related.
 
 See, e.g., Chapman v. National Union Fire Ins. Co. of Pittsburgh,
 
 171 S.W.3d 222 (Tex.Ct.App.2005);
 
 Ameriwood Indus. Int’l Corp. v. Am. Cas. Co. of Reading, Pa.,
 
 840 F.Supp. 1143, 1152-54 (W.D.Mich.1993). Most notably, in
 
 Chapman v. National Union Fire Insurance Co. of Pittsburgh,
 
 the court considered a clause that, like the clause in the instant case, excluded coverage for claims “alleging, arising out of, based upon or attributable to ... any pending or prior litigation.” 171 S.W.3d at 225. In concluding that the policy excluded coverage, the
 
 Chapman
 
 court adhered to the “eight corners rule” that “the allegations in the pleadings and the language of the insurance policy determine an insurer’s duty to defend.”
 
 Id.
 
 at 226.
 

 Acosta, in contrast, has found many out-of-state cases holding that, in specific circumstances, the determination of an exclusion’s application depended on the facts as developed through evidence.
 
 See, e.g., Home Ins. of Ill. (NH) v. Spectrum Info. Techs., Inc.,
 
 930 F.Supp. 825, 849 (E.D.N.Y.1996) (denying summary judgment based on an exclusion where the “complaints [did] not clearly identify, and the Court [could not] discern without factual development” whether the exclusion applied);
 
 Pereira v. Nat’l Union Fire Ins. Co. of Pittsburgh, PA.,
 
 525 F.Supp.2d 370, 380 (S.D.N.Y.2007) (finding that genuine issues of material fact precluded summary judgment as to certain claims). Notably, even
 
 Spectrum,
 
 one of the cases upon which Acosta relies, acknowledges that summary judgment may be appropriate based on the complaints alone in some circumstances, although it also points out the heavy burden a party moving for summary judgment bears.
 
 See
 
 930 F.Supp. at 848. Specifically, the
 
 Spectrum
 
 court noted, “It is the insurer who has the burden of demonstrating that the language of the exclusion ‘clearly and unmistakably’ applies .... [T]he insurer here must show that the exclusions apply to the facts as alleged in the complaints because there has been no determination of liability.”
 
 Id.
 
 (internal citations omitted). Similarly, in
 
 Pereira,
 
 the court determined, based on the insurance policy, the complaint from a former suit, and the judgment in the suit for which coverage was sought, that some of the claims were properly excluded under a prior litigation clause. 525 F.Supp.2d at 377.
 

 In sum, the cases we have reviewed on the issue of deciding the applicability of
 
 *576
 
 a prior litigation exclusion at the summary judgment stage reveal nothing more than the unremarkable proposition that, in some cases, extrinsic evidence is necessary due to ambiguities in the pleadings, while in other cases, extrinsic evidence may not be necessary due to the clarity of the pleadings. Therefore, whether extrinsic evidence should be considered to determine the application of the exclusions at issue is a matter to be decided on a case-by-case basis according to the general summary judgment standard: whether resolution of the legal issue depends on genuine issues of material fact.
 

 To determine whether there is a genuine issue of material fact in the instant case, we must decide whether the complaints at issue clearly establish the relationship between the two suits. Acosta urges us to undertake this consideration by viewing each count of the complaint separately, rather than by considering each complaint as a whole. To determine whether Acosta is correct in asserting that the policy required a comparison of each count in the underlying suit to the complaint in the turnover suit, as opposed to a broader comparison of each complaint, we would need to interpret the term “claim” as it is used in the prior litigation exclusion, as it is the claims that are to be compared under the exclusion.
 
 [4]
 
 However, it is unnecessary for us to settle this matter because we conclude that, even assuming Acosta’s approach is correct, the prior litigation exclusion justifies the insurers’ denial of coverage for each count of the underlying suit.
 

 Under the prior litigation exclusion, National Union and Arrowood were entitled to deny coverage for a particular claim under either of the following circumstances: (a) if the claim alleged, arose out of, was based upon, or was attributable to any pending or prior litigation; or (b) if the claim alleged any wrongful act that was the same or “Related Wrongful Act” to that alleged in pending or prior litigation. We conclude that, as far as Acosta was concerned, each count of the underlying suit arose out of the turnover suit, thus satisfying what we have labeled as circumstance “(a).” Therefore, we need not consider whether the underlying suit also alleged wrongful acts that were the same or related to the wrongful acts alleged in the turnover suit.
 

 In
 
 Taurus Holdings, Inc. v. United States Fidelity and Guaranty Co.,
 
 913 So.2d 528, 539-40 (Fla.2005), the court explained that the term “arising out of’ is broad arid “means ‘originating from,’ ‘having its origin in,’ ‘growing out of,’ ‘flowing from,’ ‘incident to’ or ‘having a connection with.’ ” The court further explained that the term “requires more than mere coincidence,” but less than proximate cause.
 
 Id.
 
 Although the court found the term “arising out of’ to be broad, it did not find it to be ambiguous.
 
 See id.
 

 Application of the definition of “arising out of’ adopted in
 
 Taurus
 
 reveals that the insurers properly applied their exclusion. One of the accepted definitions of “arising out of’ is “having a connection with.”
 
 Taurus,
 
 913 So.2d at 539. Although the underlying suit contains many different counts, all of the counts asserted against
 

 
 *577
 
 Acosta center on its efforts to obtain contracts with Marketing Specialists’ clients. The various counts assert different means by which Acosta sought to accomplish this goal: by using Marketing Specialists’ personal property; by accessing its intangible property; by infringing on its trademark; by encouraging its directors and officers to breach their duties to Marketing Specialists; and by fraudulently having Marketing Specialists’ mail re-routed to an Acosta office, among other means. Although the focus of the turnover suit was on physical property, a review of the complaints as a whole illustrates that Acosta’s alleged seizure of Marketing Specialists’ personal property was a part of its overall scheme to take over Marketing Specialists’ corner of the industry, which was made possible by the agreement represented in the Term Sheet discussed in the turnover suit. Indeed, the seizure of property such as laptops and handheld computers was vital to Acosta’s success in obtaining the data Acosta used to obtain contracts with Marketing Specialists’ former clients.
 

 Acosta argues that the lawsuits were not connected because the author of the turnover suit testified that the property at issue in the turnover suit was not the same property at issue in the underlying suit. However, a review of the turnover suit reveals that the issue sought to be created is not genuine. Notably, the turnover suit alleged that “virtually all of the ... laptops have been removed by former employees, many of which have gone to work for Acosta.” The underlying suit alleged that Acosta took laptops and used them to access intangible proprietary property. If “virtually all” of the company’s laptops were at issue in the turnover suit, then the laptops at issue in the underlying suit were also addressed in the turnover complaint. More importantly, even if there were a distinction between the property listed in the turnover complaint and the property mentioned in the underlying suit, the actions at issue in the two suits were still connected as a part of the overall scheme set forth in the underlying suit, as illustrated by the numerous similar factual allegations and the shared time frame.
 
 [5]
 

 Acosta’s arguments concerning what the evidence would reveal of the nature of the claims involved in the two suits is also unavailing. Acosta asserts that the evidence would show that the turnover suit was narrowly focused and sought only the return of property, rather than relief on claims of damage to Marketing Specialists’ goodwill, conspiracy, and breaches of fiduciary duties. Further, it asserts that the Creditors’ Trust never attempted to collect damages based on Acosta’s improper seizure of physical property. Even considering this evidence, we conclude that each count of the underlying suit was unmistakably related to the turnover suit. As noted above, the seizure of the physical property and the allegations asserted in the turnover suit were central to the underlying suit. The lack of identical causes of action or damages models is not dispositive of whether the suits or causes of action are factually related.
 

 In sum, our review of the complaints reveals that their allegations are clear
 
 *578
 
 enough to show a relationship between the turnover suit and each count asserted against Acosta in the underlying suit. That relationship was sufficient to invoke the prior litigation exclusion. In this case, the complaints speak for themselves. Therefore, we hold that the trial court properly interpreted the insurance contracts and properly granted summary judgment for National Union and Arro-wood based on the prior litigation exclusion. Accordingly, we AFFIRM.
 

 No additional motions for rehearing will be entertained. The Clerk is directed to issue the mandate forthwith.
 

 WOLF and MARSTILLER, JJ., concur.
 

 [1]
 

 . Although the trial court had not entered final judgment as to National Union at the time this appeal was filed, National Union participated as an appellee under Florida Rule of Appellate Procedure 9.020(g)(2).
 

 [2]
 

 . Although the Arrowood Policy is subject to the same terms and conditions as the National Union Policy, it contains its own additional prior litigation exclusion, which provides as follows:
 

 In consideration of the premium charged, it is hereby understood and .agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against the Insured Persons based upon or attributable to litigation pri- or to or pending at the inception date of this policy involving the Insured Organization and/or Insured Persons or arising out of the facts or circumstances underlying or
 
 *568
 
 alleged in any such prior or pending litigation.
 

 Because we conclude that Exclusion 4(e) of the National Union Policy applies, we need not consider whether Arrowood would have been entitled to deny coverage under its own exclusion independently of Exclusion 4(e)'s operation.
 

 [3]
 

 . Acosta Sales, LLC was not named in the turnover suit.
 

 [4]
 

 . The policy defined claim in pertinent part as follows:
 

 (1) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or
 

 (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:
 

 (i) service of a complaint or similar pleading^]
 

 [[Image here]]
 

 [5]
 

 . On appeal, Acosta suggests that the underlying suit related to events transpiring before June 7, 2001, while the turnover suit related to events transpiring after that date. The complaints demonstrate otherwise. In the complaint for the underlying suit, dates before and after June 7, 2001, were alleged. The significance of the June 7, 2001 date is that it was when the Term Sheet was withdrawn. However, the withdrawal of the Term Sheet is alleged in both actions, as are the events flowing from that withdrawal. Moreover, the underlying suit alleges dates both before and after June 7, 2001, illustrating one two-month timeframe.