935 So.2d 547 (2006)
Jesus FERNANDEZ and Marisol Fernandez, Appellants,
v.
HOMESTAR AT MILLER COVE, INC., Appellee.
No. 3D05-1591.
District Court of Appeal of Florida, Third District.
June 28, 2006.
Ruden, McClosky, Smith, Schuster & Russell and John H. Pelzer, Fort Lauderdale, and Norman S. Segall, Miami, and Brigid F. Cech, Fort Lauderdale, for appellants.
Leo Benitez and Lizette Benitez, for appellee.
Before COPE, C.J., and SHEPHERD and ROTHENBERG, JJ.
*548 ROTHENBERG, Judge.
The plaintiffs, Jesus Fernandez and Marisol Fernandez ("Purchasers"), appeal from an adverse final summary judgment entered in favor of the defendant, Homestar at Miller Cove, Inc., a Florida corporation ("Seller"). We affirm.
As a result of the Seller terminating a Purchase and Sale Agreement ("Agreement") that the parties entered into, the Purchasers filed a complaint against the Seller, asserting claims for breach of contract, breach of implied covenant of good faith and fair dealing, and specific performance. Thereafter, the Seller filed a motion for summary judgment. The trial court conducted a hearing, in which it reviewed the record and heard argument from the parties' counsel. Following the hearing, the trial court entered final summary judgment in favor of the Seller, finding that there were no genuine issues of material fact, and that based on its strict *549 construction of the Agreement and an addendum to the Agreement, the Seller did not breach the Agreement by terminating it.
The undisputed facts, which were before the trial court, are as follows. The Purchasers and Seller entered into the Agreement, whereby the Purchasers agreed to buy from the Seller a specific lot and the single family dwelling erected on the lot or that would be erected on the lot by the Seller. The first page of the Agreement indicates that, in addition to the base purchase price of $227,900, the Purchasers agreed to pay an additional $29,300 for a covered terrace and swimming pool, for a total purchase price of $257,200.
Paragraph 1(B)(ii) of the Agreement, entitled "Mortgage Provision," provides, in part, as follows:
If a portion of the Purchase Price is to be paid out of the proceeds of a mortgage loan and the name of the SELLER APPROVED LENDER has been inserted on the first page of this agreement, then this contract will be subject to and/or conditioned upon Buyer obtaining a firm mortgage commitment. If the amount of the mortgage loan and the name of the lender have not been inserted, then this Contract is a cash sale and is not subject to and/or conditioned upon Buyer obtaining a firm mortgage commitment.

(Emphasis added). There was no approved lender inserted on the first page of the Agreement, and the Agreement reflects that the mortgage amount was zero. Therefore, pursuant to Paragraph 1(B)(ii), the transaction was an all "cash sale," which was not contingent upon the Purchasers obtaining permanent financing.
In addition, Paragraph 3 of the Agreement, entitled "Completion," provides, in part, as follows:
The issuance of a Certificate of Occupancy for the Residence or such other similar certification by the appropriate governmental authority will conclusively establish completion of the Residence and Purchaser's unconditional obligation to close. If any items that bring the Property into compliance with the standards of construction in the county where the property is located are not completed or finished by closing, the work on all such items shall be completed by Seller within a reasonable time after closing.
In addition, Paragraph 4 of the Agreement, entitled "Extras and Options," provides, in part, as follows:

Purchaser acknowledges and understands that Seller may not be able to obtain all or part of the extras prior to or at the time of closing. In such event, Seller shall, if possible, provide same as soon as is practicable, but in no event shall Purchaser hold back any funds at closing or object to final closing with full disbursement to Seller.

(Emphasis added).
Finally, Paragraph 8(a) of the Agreement, which is titled "Date and Place of Closing: Procedure and Payment," provides, in part, as follows:
Closing of title shall take place at the office of [left blank] at such time and on such day as Seller may designate to Purchaser, giving not less than (7) days oral or written notice (the "Closing Date") unless Seller and Purchaser agree to close at an earlier date. The closing shall be held after issuance of a Certificate of Occupancy or such other similar certificate by the appropriate governmental authority.

(Emphasis added).
The Purchasers also executed an addendum to the Agreement, entitled "Addendum # 3 Options, Upgrades, and Extras" *550 ("Addendum # 3"). Addendum # 3 lists the terrace as an option, and provides the Purchasers with a $500 credit. In addition, the swimming pool is also listed as an option, with no additional amount charged.
The Seller pulled separate permits for the dwelling and swimming pool. On January 3, 2005, the Seller provided the Purchasers with the seven-day notice required by Paragraph 8(a) of the Agreement, and notified the Purchasers that the closing was scheduled for January 11, 2005. Thereafter, on January 7, 2005, the Seller obtained the certificate of occupancy for the dwelling. The pool, however, was still under construction.[1]
Although this was a "cash sale," the Purchasers signed a mortgage loan application on January 5, 2005, just six days prior to the scheduled closing. On January 10, 2005, the Purchasers' lender faxed a loan approval letter, which was subject to the completion of the swimming pool. Despite that this transaction was a "cash sale," the Purchasers did not attend the scheduled closing because they were unable to obtain financing from their chosen lender because the swimming pool was not completed. When the Purchasers failed to appear at the scheduled closing, the Seller terminated the Agreement.
The Purchasers contend that the trial court erred by granting final summary judgment in favor of the Seller where the contract is ambiguous and there were genuine issues of material fact as to the meaning of the alleged ambiguities contained in the Agreement. We disagree.
A trial court's ruling on a motion for summary judgment regarding a pure question of law is reviewed de novo. See Roberts v. Sarros, 920 So.2d 193 (Fla. 2d DCA 2006); Barnier v. Rainey, 890 So.2d 357 (Fla. 1st DCA 2004) ("`The standard of review governing a trial court's ruling on a motion for summary judgment posing a pure question of law is de novo.'") (quoting Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001)). In addition, "[t]he standard of review applicable to the question of whether a contract is ambiguous is de novo," see Garcia v. Tarmac Am., Inc., 880 So.2d 807, 808 (Fla. 5th DCA 2004), and if a contract is unambiguous, the construction of the contract presents a question of law. See Jaar v. Univ. of Miami, 474 So.2d 239 (Fla. 3d DCA 1985); see also Leisure Resorts, Inc. v. City of West Palm Beach, 864 So.2d 1163, 1166 (Fla. 4th DCA 2003) ("The standard of review applicable to contract interpretation is de novo.").
In the instant case, the issue that the trial court was called upon to resolve was whether, as a matter of law, the Seller, based upon the Agreement, Addendum # 3, and undisputed facts, prematurely scheduled the closing. If the Seller prematurely scheduled the closing, the Purchasers, regardless of the fact that they did not attend the closing, were not in breach of the Agreement, and therefore, the Seller breached the Agreement by terminating the Agreement. On the other hand, if the Seller did not prematurely schedule the closing, then the Purchasers breached the Agreement by not attending the scheduled closing, and therefore, the Seller rightfully terminated the Agreement.
As did the trial court, we find that the Agreement and Addendum # 3 are clear and unambiguous. As such, we are required *551 to construe these documents as written, since they are the best evidence of the parties' intent. See Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. 4th DCA 2000) ("It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties. Where contracts are clear and unambiguous, they should be construed as written, and the court can give them no other meaning.") (citations omitted); Walgreen Co. v. Habitat Dev. Corp., 655 So.2d 164, 165 (Fla. 3d DCA 1995) ("When a contract is clear and unambiguous, the court is not at liberty to give the contract `any meaning beyond that expressed.'") (quoting Bay Mgmt., Inc. v. Beau Monde, Inc., 366 So.2d 788, 791 (Fla. 2d DCA 1978)). A construction of Paragraph 3 of the Agreement indicates that the Purchasers' "unconditional obligation to close" is triggered by the "completion of the Residence," which is evidenced by the "issuance of a Certificate of Occupancy for the Residence or such other similar certification by the appropriate governmental authority." We conclude that the term "Residence," as used in Paragraph 3, includes only the actual dwelling, not the swimming pool. Therefore, once the Purchasers received the seven-day notice required by Paragraph 8(a) and the certificate of occupancy was issued, the Purchasers were obligated to close on the scheduled date.
In support of this conclusion, we note that the swimming pool is one of the options listed in Addendum # 3. When entering into the Agreement, the Purchasers, under Paragraph 4, acknowledged that the "Seller may not be able to obtain all or part of the extras prior to or at the time of closing," but that under "no event shall Purchaser . . . object to final closing with full disbursement to Seller." As such, the parties are bound by the clear and unambiguous language contained in the Agreement and Addendum # 3, which obligates the Purchasers to close the transaction once the certificate of occupancy is issued for the residence, even if the options are incomplete.
Although we acknowledge that it would have been more reasonable for the closing to take place after the completion of both the dwelling and swimming pool, as the Agreement and Addendum are clear and unambiguous, "the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995). Unfortunately, as the Purchasers agreed that this real estate transaction was a "cash sale," which was not contingent upon the Purchasers obtaining permanent financing, the Purchasers' lender's refusal to provide permanent financing because the swimming pool was not completed is irrelevant. Accordingly, we affirm.
Affirmed.
SHEPHERD, J., concurs.
COPE, C.J. (dissenting).
Respectfully, the trial court misinterpreted the Purchase and Sale Agreement. We should reverse the summary judgment.
This litigation arose out of a failed real estate transaction. The issue is whether developer-seller Homestar at Miller Cove, Inc. scheduled a closing prematurely.
The buyers entered into an agreement with the developer under which the developer agreed to build a residence with a covered terrace and swimming pool. The buyers did not insert a financing contingency into the agreement.
The developer built the dwelling and obtained a certificate of occupancy. The *552 developer had obtained a separate permit for the swimming pool. At the time the certificate of occupancy was issued for the dwelling, the swimming pool had not been completed.
The developer took the position that under the contract, the issuance of a certificate of occupancy was the event which allowed the developer to require a closing. In the meantime the buyers had attempted to obtain financing, but the lender would not provide a loan until the swimming pool was completed. The buyers failed to close on the date set by the developer, and the developer retained the buyers' deposit. The buyers brought suit against the developer seeking return of the deposit and other damages or, alternatively, specific performance. The trial court granted summary judgment for the developer. The buyers have appealed.
The question is how to interpret the parties' contract. Paragraph 3 of the Purchase and Sale Agreement is entitled "Completion" and states in part:
The issuance of a Certificate of Occupancy for the Residence or such other similar certification by the appropriate governmental authority will conclusively establish completion of the Residence and Purchaser's unconditional obligation to close. If any items that bring the Property into compliance with the standards of construction in the county where the property is located are not completed or finished by closing, the work on all such items shall be completed by Seller within a reasonable time after closing.
The buyers argue that the term "Residence" means the house plus the covered terrace and swimming pool, while the developer argues that "Residence" means the dwelling only. The buyers argue that, at a minimum, there is an ambiguity in the contract which precludes summary judgment.
In my view, the wording of the Purchase and Sale Agreement means that the "Residence" includes the dwelling, covered terrace, and swimming pool. The Agreement provides in part:
Seller agrees to sell and Buyer agrees to purchase the following described real estate, together with the residential dwelling erected or to be erected thereon, as hereinafter described:
LOT 27, BLOCK 3 of MILLER COVE II, according to the Plat thereof, as recorded in Plat Book ____, at Page ____, of the Public Records of Miami-Dade County, FL.
Commonly known as MILLER COVE II.
Model Name: Captiva 5. The Lot and dwelling comprises the "Property."
The sale and purchase will be made upon subject to and in accordance with the following terms and conditions:
Base Price $ 225,900 + Lot Premium $ 2,000 = $ 227,900.
Other: COVERED TERRACE 40'X10' & POOL 15'X30' $ 29,300.
TOTAL PURCHASE PRICE: $ 257,200
(Emphasis added). The above language describes the residential dwelling as including the Captiva 5 dwelling plus the covered terrace plus the swimming pool.
In this case, the developer elected to pull a separate permit for the swimming pool. Where the developer elects to use that procedure, logically the developer must obtain a certificate of occupancy for the dwelling, and a final inspection approving the swimming pool, before calling for a closing. As quoted previously, the "Completion" section of the Agreement states that "The issuance of a Certificate of Occupancy for the Residence or such other *553 similar certification by the appropriate governmental authority will conclusively establish completion of the Residence and Purchaser's unconditional obligation to close." (Emphasis added). The developer represented to the court at oral argument that a certificate of occupancy is issued upon completion of a dwelling, but in the case of the separate permit for the swimming pool, the final approval would come in the form of a final inspection.
The trial court came to a different conclusion because the Agreement also contained Addendum # 3, entitled "Options, Upgrades, and Extras." This contains a list of twenty-two items for a total of $16,167. This included such extras as a circular driveway, kitchen cabinets and upgraded tile.
Also included in Addendum # 3 were the terrace and pool as follows:

 Option # Description Price
 . . . .
 2 Terrace 40'×8' See Purchase &
 Sale Agreement (500)
 3 Pool 15×30 see Purchase & Sale
 Agreement

(Emphasis added). Although included on this list, the buyers received a credit of $500 for the terrace and no charge for the pool. The Addendum simply referred the reader back to the Purchase and Sale Agreement for both the terrace and the pool.
Because the terrace and pool were included in the Addendum entitled "Options, Upgrades, and Extras," the trial court concluded that paragraph four of the Agreement, entitled "Extras, Options," applied. That paragraph states, in part:
Purchaser acknowledges and understands that Seller may not be able to obtain all or part of the extras prior to or at the time of closing. In such event, Seller shall, if possible, provide same as soon as is practicable, but in no event shall Purchaser hold back any funds at closing or object to the final closing with full disbursement to the Seller.
The trial court concluded that the language just quoted allows the developer to demand a closing without completing the covered terrace and swimming pool.
The problem with that analysis is that the covered terrace and swimming pool appear in two places, not just one place, in this contract. As already stated, the first page of the Purchase and Sale Agreement contains the language identifying "the residential dwelling erected or to be erected thereon, as hereinafter described," and thereafter lists the Captiva 5 home plus covered terrace and swimming pool. The better reading of the Purchase and Sale Agreement is that the Captiva 5 home plus covered terrace and swimming pool are the "Residence" which must be completed prior to closing. The fact that the covered terrace and swimming pool were also listed on the Addendum is surplusage having no significance, because the Addendum did not impose any additional charge for the swimming pool or covered terrace  indeed, in the case of the covered terrace the buyer actually received a $500 credit.
In conclusion, the correct interpretation is that the "Residence" consists of the Captiva 5 home plus covered terrace and swimming pool. The developer properly obtained a certificate of occupancy on the Captiva 5 dwelling, but had not obtained a final inspection approving the swimming pool when the developer called for a closing. The closing was scheduled prematurely by the developer and the summary judgment should be reversed.[*]
NOTES
[1] During oral argument, the Seller's counsel represented to this court that, upon a governmental agency's final approval of a swimming pool, the agency issues a final inspection, not a certificate of occupancy. In addition, the final inspection for the swimming pool was obtained approximately one month after the scheduled closing.
[*] Alternatively, if the foregoing analysis is not accepted, then at a bare minimum the contract is ambiguous because the covered terrace and swimming pool are included both in the basic description of the premises on the first page of the Agreement, and again in the Addendum identifying "Options, Upgrades, and Extras." Under either analysis, the summary judgment should be reversed.