# Third District Court of Appeal

**State of Florida**

Opinion filed May 11, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-2011
Lower Tribunal No. 07-536-K
_____


**Underwater Engineering Services, Inc., etc.,**
Appellant,

vs.

**Utility Board of the City of Key West,**
Appellee.


An Appeal from the Circuit Court for Monroe County, Tegan Slaton, Judge.

Palmer Law Group and Andrew J. Palmer (Fort Lauderdale); Burlington and Rockenbach, Philip M. Burlington and Adam J. Richardson (West Palm Beach), for appellant.

Robert C. Tilghman and Nathan Eden, for appellee.


Before EMAS, LOGUE and SCALES, JJ.

EMAS, J.

Appellant/Plaintiff, Underwater Engineering Services, Inc. ("Underwater"), appeals from a final judgment, entered after a nonjury trial, in favor of Appellee Utility Board of the City of Key West ("the Utility Board") on Underwater's breach of contract claim, as well as the Utility Board's counterclaim. We hold that there is competent substantial evidence in the record to support the trial court's determination in favor of the Utility Board on Underwater's breach of contract claim and affirm that portion of the final judgment. We further hold that the trial court erred in entering judgment in favor of the Utility Board on its counterclaim, as the evidence establishes that Underwater was not provided the contractually-required notice and opportunity to cure the alleged defects before the Utility Board hired a different contractor to correct and repair Underwater's work. We therefore reverse that portion of the final judgment and remand for entry of final judgment in favor of

Underwater on the Utility Board's counterclaim.

## FACTS AND BACKGROUND

This action arises from a construction contract ("the Contract") between Underwater and the Utility Board. The Utility Board hires contractors as needed to inspect over-the-water concrete and steel poles, and to perform necessary maintenance and repairs. The inspections may reveal issues affecting or compromising the structural integrity of the poles; they may require the pouring of

a concrete collar around the base of the pole for additional support, or the application of a particular coating to areas needing repair or to areas where a prior coating application may have deteriorated.

In May 2004, the Utility Board issued a call for bids on a project entitled "Repair Over the Water Transmission Pole Foundations." The project involved, among other things, structural concrete repairs, coating repair and new coating placement. Specifically, the successful bidder was to repair approximately fiftyseven concrete pole structures supporting electric transmission lines running from Key West to the Seven Mile Bridge. Pursuant to the bid schedule, the Contract was a unit-price contract—the bid price was not a lump sum, but was instead broken down into subparts for each item of work or material to be used— and the bidders proposed a price per unit. Following the bidding process, Underwater was awarded the Contract, which was executed in October of 2004, and a Notice to Proceed was issued in January 2005. The final contract price (based on the unit prices bid by

Underwater) was $767,585.50.

The Contract contained the following relevant provisions:

Pursuant to "Section 01010-Summary of Work":

**1.8 Construction Sequence**
A. Prior to commencement of Work, complete a detailed Pre-

Construction Inspection of all structures. This inspection shall identify repairs on each structure….

B. Required Observation and Review
    1. Notify the Resident Engineering Representative 24 hours prior to completing the following work:…

        d) Completion of surface preparation and prior to application of any coatings, sealers, or miscellaneous patching material in accordance with the applicable sections.

Pursuant to "Section 01019: Contract Considerations":

## 1.4 Change Procedures…

C.    The Contractor may propose changes by submitting a Request for Change Order to the Engineer, describing the proposed change and its full effect on the Work. Include a statement describing the reason for the change and the effect on the Contract Price and Construction Time with full documentation. Document any requested substitutions in accordance with Section 01600.

D.    Unit Price Change Order: For pre-determined unit prices and quantities, the Change Order will be executed on a fixed unit price basis. Changes in Contract Price or Construction Time will be computed as specified for Time and Material Change Order.

E.    Engineer may issue a directive signed by the Owner, instructing the Contractor to proceed with a change in the Work for subsequent inclusion in a Change Order. Document will describe changes in the work and designate method of determining any change in Contract Price or Construction Time. Promptly execute the change….

## 1.5 Measurement and Payment – Unit Prices….

C. Estimated Quantities: Quantities and measurements indicated in the Unit Price Bid are scheduled for bidding purposes only. Actual quantities and measurements supplied or placed in the Work shall determine payment.

E. Defect Assessment: The Work, or portions of the Work, not conforming to specified requirements, shall be replaced by the Contractor at Contractor's expense.

Pursuant to "Section 01025: Measurement and Payment":

**1.5 DEFECT ASSESSMENT**
A.     Replace the Work, or portions of the Work, not conforming to specified requirements.

B.     If, at the request of the Contractor and in the opinion of the Engineer, it is not Practical to remove and replace the Work, the Engineer will direct one of the following remedies:

> 1.     The defective Work may remain, but the Unit Price will be adjusted to a new price as agreed to by the Owner and Engineer.

> 2.     The defective Work will be partially repaired to the instructions of the Engineer, and the Unit Price will be adjusted to a new price.

C.     The authority of the Engineer to assess the defect and identify payment adjustment is final.

Ed Giesler was the project engineer and Underwater's primary contact with the Utility Board.  Tom Fettig was Underwater's project manager. Pursuant to the Contract, the preconstruction inspection of the Seven Mile Bridge area occurred on June 22 and 23, 2005.  The inspection was conducted by the Utility Board's resident engineering representative, Anchor Structural, represented by Wayne Fey and Mark

5

Demarest.

**Underwater's Claim: Breach of Contract (Coating Work)**

Underwater's primary claim against the Utility Board concerns an item designated as "MIS4" and described as "Concrete Coating Repair." In the blank bid schedule, the Utility Board estimated the quantity of MIS4 units to be 200 square feet. Underwater's bid stated it would perform MIS4 at a unit price of $110, so the total price of the concrete coating repair (based on the estimated 200 square feet x $110/square feet) was $22,000.

On June 23, 2005, a consultant on the project sent an email to Giesler and Dale Finigan, also with the Utility Board, explaining he was trying to get the Utility Board a revised estimate. The consultant indicated that based on the inspections performed on June 22, 2005, they had a "rough handle on the amount that the units will change on the upper portion of the project." In response to a question from the consultant, Finigan advised he was okay with building a contingency amount into the numbers, but noted it should be "a reasonable amount." Though the emails contained no dollar amounts or quantities, no one from the Utility Board followed up or requested clarification or additional specificity.

The final Preconstruction Inspection Report for the fifty-seven poles in the Seven Mile Bridge area was sent by Underwater to the Utility Board on June 29,

6

2005. In the cover letter, Fettig wrote: "Please review this submittal as soon as possible. We are planning on starting the work and procuring the material needed to complete this work this week." The report details the repair work, including the MIS4 coating work on fifty-seven poles, but it contains no numbers or costs, either estimated or actual. Though Underwater's CEO testified that calculating the amount of coating to be applied to the poles is a matter of "basic math," the detailed formula he provided at trial was contained nowhere in the Preconstruction Inspection Report, and the parties disagree as to who was responsible for making these calculations.

At some point during July 2005, Fettig, Underwater's project manager and the person responsible for making this project profitable for Underwater, prepared two spreadsheets. These spreadsheets compared the revenue anticipated by the project as originally estimated and agreed to by the Utility Board with the revenue it could realize if the coating was increased <u>from 200 square feet to 5,006 square feet</u>. Using the original estimate for coating, Underwater faced a loss of approximately $168,891.71. However, by increasing the amount of coating from 200 square feet to 5,006 square feet, Fettig's spreadsheet showed Underwater's revenue on the project would increase by $528,660.00 and yield a profit of $433,579.29. Though

Fettig and other members of Underwater thought it prudent to advise the Utility

Board of this significant change in the total footage and resulting increase in cost, Dean Reynolds, Underwater's branch manager, told Fettig not to do so. Even though Fettig testified that he personally believed this overrun should have been revealed to the Utility Board, he also indicated that this overrun did not technically require a change order because the parties were operating under a unit-price contract. The differential in the cost did not relate to the unit price of the coating (which remained the same), but instead related to the total square footage of the poles to be coated. Fey, on the other hand, as president of Anchor Structural, testified that an increase in the amount of coating, which consequently increased the contract price by more than $500,000.00 would "absolutely" and "without a doubt" require a change order.[1] However, no change order was ever submitted to the Utility Board, nor was any authorization sought from the Utility Board before Underwater proceeded to apply 5,006 square feet of coating (instead of 200 square feet).

One of the primary points at issue in the appeal (and directly related to this increase in square footage of coating) is whether Underwater gave proper notice to the Utility Board in between two critical steps of the project: the surface

---

[1] Fey further testified that when Anchor Structural was involved in similar construction projects utilizing unit-pricing contract, if the estimated quantities were going to be increased such that the contract price is exceeded, the contractor would request a change order and, if the owner approved the change order, the work would then proceed.

preparation of the fifty-seven poles and the application of the coating to those poles.

Pursuant to section 01010, 1.8B.1.d of the Contract, the resident engineering representative was to be notified twenty-four hours prior to completing the surface preparation and before coatings were applied to the poles. The obvious purpose of such notice was to permit the Utility Board an opportunity to inspect the structures and determine whether the poles were properly prepared before the actual coating was applied (and, if not properly prepared, to ensure that the necessary additional preparation work was undertaken before the coating was applied). To that end, on Wednesday, August 10, 2005, Fettig sent the Utility Board and Anchor Structural a "3-Week Look Ahead Schedule" purportedly to establish that Underwater would be coating the poles in the Seven Mile Bridge area roughly for a few days sometime between the dates of August 11 and August 22.[2] Underwater contends that this schedule satisfied the twenty-four hours' notice requirement and was enough to advise the Utility Board and Anchor Structural when the surface preparation would be complete and the coating would begin.

On August 16, 2005, Giesler was advised (for the first time) that the poles had been coated and the contract price was well over $1,000,000.00. At this point, Giesler immediately told Underwater personnel to stop working on that portion of

---

[2] Witnesses testified, however, that it was not possible to coat fifty-seven poles in a span of two to three days.

the Contract. Though Underwater contended that the onsite inspector/resident engineer, Demarest from Anchor Structural, knew the coating work was being performed, Demarest testified he first learned of it several days <u>after</u> it had been completed and that Underwater did not notify him after the poles were pressurewashed and prepared but before they were coated. Similarly, Wayne Fey also testified he did not learn that the coatings had been applied to the poles until "all

poles in question were supposedly done."

The second point on appeal is whether Underwater properly applied the coating to the fifty-seven poles. Underwater represents that it properly applied the coating pursuant to the contract specifications. However, Demarest had the following observations upon his inspection on August 30, 2005, two to three weeks after the poles had been coated:

> I went to measure coating applied on the Seven Mile Bridge Structures. 41 out of the 57 were coated over the peeling remaining with no preparation. When we approached the bases anywhere the boat touched the coating peeled off. I took photographs relative to the peeling and the 1'-2' of exposed base which was not coated. It is apparent that the coating on all of the bases can be removed easily…Much of the coating was applied over areas that were not prepared properly.

Additionally, on August 26, Bill Williams of Power Engineers sent Giesler a letter informing the Utility Board of the coating of the fifty-seven poles:

Last week, the Contractor coated approximately 57 poles in the Seven Mile Bridge area of the project. This coating was part of the MIS4 unit in the contract . . . . As is required in the specification, Section 010101.8.B.1.(d), we were to be notified after the surface preparation was completed and prior to the placement of the coating, to verify that the surface preparation was performed in accordance with the specifications. Our field inspector was not notified, until he received a call from the Contractor on last Friday, that the work was completed and was asked to verify the quantities for payment. The inspector received no requests to inspect the surface preparation on these structures.

Upon inspection by our field inspector, it is evident that in many places the proper surface preparation, according to the specifications, was not done in those locations. This is evidenced by the fact that the structures show coating over the old peeling coating that was to be removed during the surface preparation process, and would have been removed if the surface had been prepared properly. Along with this, there are other factors that allow speculation that the surface preparation was not performed properly or at all.

Based on these items, the field inspector cannot verify these units for payment. Further, Power Engineers, Inc. will not be able to certify that these units were performed in accordance with the specifications at the conclusion of this project.

Because the Utility Board did not believe the work was fulfilled pursuant to the terms of the contract, it did not pay Underwater for the work performed. Thereafter, Underwater filed a complaint against the Utility Board for breach of contract, alleging the Utility Board failed to pay for the work it completed in connection with the coating on the fifty-seven poles.[3] The Utility Board denied

_____

[3] In addition to the breach of contract claim, Underwater contends it was owed damages due to a lost pour day and retainage. We find this argument unavailing, however, as there was competent substantial evidence that any delay in pouring the

11

Underwater's allegations, and asserted as affirmative defenses that Underwater failed to satisfy conditions precedent (i.e., notice and opportunity to inspect following preparation but prior to commencement of the coating), and that Underwater breached the

Contract as well as the implied covenant of good faith and fair dealing.

**The Utility Board's Counterclaim: Breach of Contract (Structural Collars)**

In addition to answering the complaint, the Utility Board asserted a counterclaim, alleging that Underwater defectively constructed the concrete structural collars on eight poles. The Utility Board sought damages for the cost incurred in repairing these allegedly defective collars.

The subject of the Utility Board's counterclaim is an item described in the Contract as a "Structural Collar for Transmission Pole." The Contract estimated that a total of thirty of such concrete collars would be poured. As of October 6, 2005, Underwater had poured and completed a total of twenty-five structural concrete collars. However, in 2009, less than four years later, while another contractor was conducting a pre-construction inspection prior to beginning a different job on the site, that contractor discovered that eight of the collars Underwater had poured in

---

collars was not attributable to the Utility Board, but to Underwater.

12

August 2005 were already showing signs of premature and severe deterioration. The Utility Board retained Joseph Amon, an engineer, to perform testing and determine the cause of the deterioration. Amon testified that the compressive strength of the concrete exceeded the required strength specified in the Contract and that the concrete was not sufficiently mixed prior to placement which would "lead to areas of higher water cement rations and areas of lower water cement rations and lead to corresponding areas of higher porosity and lower porosity." These areas of higher porosity would allow for both accelerated water absorption and salt crystal deposition. Amon further testified that the technology used to form the collars specified in the Contract is an acceptable method of reinforcing piles with collars and has been used in recent years in other projects. Finally, the defects he found in the core samples demonstrated poor quality workmanship, likely by allowing water to enter that did not meet industry standards.

Underwater, on the other hand, relied on the opinion of expert engineer Dr. William Hartt. Dr. Hartt testified that the type of high-strength concrete required for the collars is inherently problematic, and that the higher the strength, the more brittle the material becomes. Dr. Hartt further explained that the manner in which Underwater sought to repair the collars reflected "technology from thirty years ago" rather than what the Department of Transportation has been doing for several

decades. Dr. Hartt thus characterized this manner of repair as "antiquated," opining that the Utility Board was "not incorporating present-day technology."

In defense to the counterclaim, Underwater asserted that despite the contract language, the Utility Board never provided Underwater with the opportunity to cure the defective collars as it was contractually bound to do.

In 2013, the case proceeded to a five-day nonjury trial. At the conclusion of the trial, the court rendered a judgment against Underwater, in effect awarding Underwater no damages on its breach of contract claim after determining that Underwater "failed to perform every condition precedent of the Contract." The court stated:

> The reasons [Underwater] failed to comply can be simply put as "shoddy work, unfamiliarity as to how to properly stabilize marine utility poles, a complete lack of understanding of who had authority over the entirety of the project at [the Utility Board] and many complaints and excuses, made by [Underwater] without the ability to cure their failings."

The court also awarded the Utility Board judgment on its counterclaim with respect to the concrete collars. Underwater appeals.

**ANALYSIS**

In reviewing a judgment rendered after a bench trial, "the trial court's findings of fact come to the appellate court with a presumption of correctness and will not be disturbed unless they are clearly erroneous." Emaminejad v. Ocwen Loan Servicing, LLC, 156 So. 3d 534, 535 (Fla. 3d DCA 2015). Thus, they are

14

reviewed for competent, substantial evidence. <u>Verneret v. Foreclosure Advisors, LLC</u>, 45 So. 3d 889, 891 (Fla. 3d DCA 2010). Even if a trial court's judgment is insufficient in its findings of fact, the judgment "should be affirmed if the record as a whole discloses any reasonable basis, reason or ground on which the judgment can be supported." <u>Firestone v. Firestone</u>, 263 So. 2d 223, 225 (Fla. 1972).

To the extent the Contract must be interpreted, such interpretation is reviewed de novo. <u>Fernandez v. Homestar at Miller Cove, Inc.</u>, 935 So. 2d 547, 550 (Fla. 3d DCA 2006). However, in reviewing the trial court's application of the terms of a contract, courts are "powerless to rewrite [a] contract to make it more reasonable or advantageous to one of the parties . . . or to substitute [their] judgments for that of the parties to the contract in order to relieve one of the parties from the apparent hardships of an improvident bargain." <u>Id.</u> at 551.

## **Underwater's Claim**

Underwater's complaint sought damages against the Utility Board for breach of contract, alleging it remains unpaid nearly $697,000 dollars under the Contract. The trial court's factual findings with regard to this cause of action included the following: "Pursuant to the Contract, [Underwater] was to notify [the Utility Board] once the cleaning and surface preparation was completed." We find the trial

15

court correctly construed and applied Section 01010, 1.8 B.1.d of the Contract, which stated:

B. Required Observation and Review

1. Notify the Resident Engineering Representative 24 hours prior to completing the following work:…

> d) Completion of surface preparation and prior to application of any coatings, sealers, or miscellaneous patching material in accordance with the applicable sections.

There is competent and substantial evidence in the record that Underwater breached this provision of the Contract. The testimony and other evidence, in a light most favorable to sustaining the trial court's judgment, established that Underwater failed to notify the Utility Board that the surface preparation on the fifty-seven poles was complete and that the poles were ready for inspection twenty-four hours prior to the application of the coating. Both Demarest and Fey testified that they were not notified that the surface preparation was completed prior to the coating of the poles.

Similarly, Bill Williams of Power Engineers sent Giesler a letter informing him that their field inspector was not notified that the surface preparation had been completed and had received no requests to inspect the structures prior to commencement of the coating process. Once the poles were actually inspected by the Utility Board (after application of the coating had already taken place), it was

16

evident to the Utility Board that the surface preparation was not performed in accordance with the project specifications.

Additionally, there is no question that the implied covenant of good faith and fair dealing attaches to the performance of these contractual obligations. See QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n, Inc., 94 So. 3d 541 (Fla. 2012) (stating "Florida contract law does recognize an implied covenant of good faith and fair dealing.") As the Florida Supreme Court noted in QBE Ins. Corp., the "covenant is intended to protect 'the reasonable expectations of the contracting parties in light of their express agreement.'" Id. at 548 (quoting Barnes v. Burger King Corp., 932 F. Supp. 1420 (S.D. Fla. 1996)).

Here, Underwater's failure to properly notify the Utility Board and permit a timely inspection of the surface preparations prior to the coating was directly linked to its decision to increase by more than twenty-five fold the number of square feet to be coated (leading to a dramatic increase in cost), without notifying the Utility Board of this change. Though Fettig testified he would have notified Underwater of this resulting dramatic increase in the contract price prior to applying the coating, he was advised by his superior, Reynolds, not to do so. Thereafter, Demarest was told by Underwater's onsite superintendent, Glenn Patterson, that Underwater had found a "loophole" in the Contract, and that the poles were coated without having first provided notice and an opportunity for the

17

Utility Board to inspect the preparation work. Patterson told Demarest he simply did what he "was told to do."

The competent substantial evidence supports the conclusion that Underwater purposefully avoided a post-preparation, pre-coating inspection (and the Contract's requirement for notice of same) because such an inspection surely would have led the Utility Board to discover the expanded scope of the coating project, and the resulting increase of nearly $528,660.00 in the contract price. The evidence supported a finding that Underwater breached the express terms of the Contract and the implied covenant of good faith and fair dealing, and that the Utility Board was thereby relieved of its contractual obligation to pay for this work.

### The Utility Board's counterclaim

With regard to the Utility Board's counterclaim—namely, that Underwater breached the Contract for failing to properly pour eight concrete collars according to the Utility Board's specifications for poured concrete—Underwater raised two defenses at trial, one of which we determine to be meritorious.[4] Underwater

---

[4] Underwater alternatively contended that, pursuant to the Spearin doctrine (Spearin v. U.S., 248 U.S. 132 (1918)), known in Florida as the implied warranty of constructability, it is not responsible for the consequences of defects in the plans and specifications. Id. at 136. By raising this defense, Underwater had the burden to prove not only that there was a defect in the specifications, but that the defect in the specifications was the proximate cause of the failure of the eight collars. See Rick's Mushroom Serv., Inc. v. U.S., 521 F.3d 1338, 1345 (Fed. Cir. 2008) (holding contractor was required to prove that "defect in [design] specifications was the proximate cause" of the damages flowing from the breach of implied warranty created under Spearin). Because we resolve the Utility Board's

18

asserted that the Utility Board was required to notify Underwater that eight collars were defective, and to permit Underwater an opportunity to cure the defects, before engaging someone else to correct, repair or replace the collars.

At trial, the Utility Board presented evidence that it had been using the same specifications for pouring concrete collars since the late 1980's or early 1990's, and none of the nearly fifty collars poured previously, with the exception of the eight collars poured by Underwater, ever failed or deteriorated. The Utility Board introduced Amon's testimony, who opined that the defects he found in the core samples demonstrated poor quality workmanship, likely by allowing water to enter the mix, and did not meet industry standards.

The relevant portion of the Contract, entitled "Defect Assessment," provides in part:

**1.5 DEFECT ASSESSMENT**
A.     Replace the Work, or portions of the Work, not conforming to specified requirements.

B.     If, at the request of the Contractor and in the opinion of the Engineer, it is not Practical to remove and replace the Work, the Engineer will direct one of the following remedies:

    1.     The defective Work may remain, but the Unit Price will be adjusted to a new price as agreed to by the Owner and Engineer.

---

counterclaim on other grounds, it is unnecessary to reach the merits of this alternative defense.

> 2. The defective Work will be partially repaired to the instructions of the Engineer, and the Unit Price will be adjusted to a new price.

The uncontested evidence at trial established that the Utility Board did not give Underwater the opportunity to "[r]eplace the [w]ork, or portions of the [w]ork, not conforming to specified requirements." Given the evidence presented, and in light of the Defect Assessment provision, which explicitly provides that Underwater must be afforded the opportunity to replace any of the work that was "not conforming to specified requirements," the trial court erred in finding in favor of the Utility Board on its counterclaim and awarding damages.[5] We therefore reverse that portion of the final judgment, and remand for entry of final judgment in favor of Underwater on the Utility Board's counterclaim.

## **CONCLUSION**

We affirm that portion of the final judgment which found for the Utility Board on Underwater's claim for breach of contract. We reverse that portion of the final judgment which found for the Utility Board on its counterclaim for breach of contract. We remand with directions to enter final judgment in favor of

---

[5] The final judgment makes no factual findings with regard to the counterclaim, nor does it engage in any discussion or analysis of the Defect Assessment provision of the Contract. The final judgment merely finds that the Utility Board shall recover on its counterclaim and awards damages in the amount paid by the Utility Board to assess the cause of the defective collars, together with the cost to replace the defective collars and prejudgment interest.

20

Underwater on the Utility Board's counterclaim and for further proceedings consistent with this opinion.