# Third District Court of Appeal

## State of Florida

Opinion filed April 12, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D16-1065 & 3D16-1865
Lower Tribunal No. 15-13350

_____


**Trump Endeavor 12 LLC,**
Appellant,

vs.

**Fernich, Inc. d/b/a The Paint Spot,**
Appellee.


Appeals from the Circuit Court for Miami-Dade County, Jorge E. Cueto, Judge.

Bruce S. Rogow and Tara A. Campion (Fort Lauderdale), for appellant.

Taylor Espino Vega & Touron, Daniel R. Vega and Vanessa A. Van Cleaf, for appellee.


Before EMAS, LOGUE and SCALES, JJ.

EMAS, J.

In these consolidated appeals, appellant Trump Endeavor 12, LLC ("Trump") seeks review of two trial court orders: (1) a final judgment of foreclosure of a construction lien by appellee, Fernich, Inc., d/b/a The Paint Spot ("Paint Spot"); and (2) a final judgment awarding attorney's fees and costs to Paint Spot.[1] We affirm, holding that competent substantial evidence supports the trial court's determination that Paint Spot substantially complied with the statutory lien provisions in section 713.06(2), Florida Statutes (2013), and that Trump failed to establish it was adversely affected by any omission or error in the Notice to Owner ("NTO").

**BACKGROUND AND PROCEEDINGS BELOW**

On October 21, 2014, Paint Spot recorded a Claim of Lien against the Trump National Doral Miami, owned by Trump. When Trump failed to pay $32,535.87 owed to Paint Spot for paint and related materials, Paint Spot filed a complaint to foreclose its Claim of Lien. Trump asserted that the Claim of Lien was invalid because it identified the wrong contractor on the project and because Paint Spot failed to comply with the provisions of section 713.06(2)(a).

The evidence and testimony at trial, taken in a light most favorable to upholding the judgment on appeal,[2] reveals the following:

---

[1] As to the final judgment for attorney's fees, Trump seeks reversal only in the event this court reverses the foreclosure final judgment, and does not otherwise challenge the merits of that judgment.

[2] Underwater Eng'g Svcs., Inc. v. Utility Bd. of City of Key West, 194 So. 3d 437

The project at the Trump National Doral Miami consisted of two parts: renovations to the property's ten lodges ("the Lodge Project") and renovations to the clubhouse ("the Clubhouse Project"). Both the Lodge Project and the Clubhouse Project share the same property address: 4400 NW 87 Avenue, Miami, Florida.

Trump hired a different general contractor for each of the two projects: Straticon, LLC for the Lodge Project, and T&G Constructors for the Clubhouse Project. Straticon hired M&P Reynolds, Inc. ("M&P") to furnish paint and labor for the Lodge Project, which in turn contracted with Paint Spot to supply paint and related materials. Paint Spot negotiated pricing with M&P, which M&P submitted to Straticon.[3] Trump then approved M&P's price quotations.[4] Trump recorded multiple Notices of Commencement ("NOC") for the Lodge Project, identifying Straticon as the general contractor for that project, and later recorded a NOC naming T&G as the general contractor for the Clubhouse Project. All the NOCs disclosed the same address for both projects: 4400 NW 87 Avenue, Miami, Florida.

_____

(Fla. 3d DCA 2016); Hall v. Hall, 190 So. 3d 683, 684 (Fla. 3d DCA 2016).

[3] According to the trial testimony of Paint Spot's president (which testimony the trial court found credible), Paint Spot dealt directly with M&P only and did not know that Straticon and T&G were the project's general contractors.

[4] Trump directly negotiated pricing with subcontractors, rather than allowing its general contractors to do so.

Prior to supplying materials to the Lodge Project, Paint Spot's president, Juan Carlos Enriquez, visited the project site for the purpose of obtaining a copy of the NOC, so that Paint Spot could use it to prepare its statutory NTO. Enriquez made it a habit to obtain the NOC from the owner of the project, rather than the general contractor or subcontractor, to ensure that his NTO contained the correct information. When Enriquez asked for the NOC from Trump's Director of Construction, Frank Sanzo, Sanzo mistakenly handed Enriquez the T&G NOC instead of the Straticon NOC. At this point, Enriquez was unaware that there was a different general contractor for each of the two projects.

Using this T&G NOC, Paint Spot prepared and timely served its NTO on Trump and on T&G by certified mail in November 2013.[5] Paint Spot began supplying materials to the Lodge Project on November 8, 2013.

On November 21, 2013, Straticon's project manager, Jamie Gram, sent an email to Claudio Bravo, a Benjamin Moore representative and Paint Spot's paint distributor. In this email, Straticon's project manager advised Bravo that, after reviewing Paint Spot's NTO, he determined that it had incorrectly been filed under the T&G NOC, and that the NTO needed to be corrected and addressed to Straticon as the general contractor. Attached to this email was a copy of Paint Spot's NTO.

---

[5] Importantly, the evidence established that Straticon timely received a copy of the NTO that had been served on Trump and on T&G.

4

Bravo forwarded Straticon's email to Enriquez and, two days later, Enriquez responded that it was being taken care of. However, due to oversight, Enriquez never prepared or served a corrected NTO on Straticon. Nevertheless, there can be no doubt that, as of November 21, 2013 (at the latest), Straticon was in possession, and had actual knowledge, of the NTO, as it was Straticon's own project manager who reviewed the NTO, discovered the discrepancy, and sent the email alerting Benjamin Moore and Paint Spot of the error.

Notwithstanding the error on the face of the NTO, Straticon knew that Paint Spot was suppling materials to the Lodge Project and knew that Paint Spot was M&P's only paint supplier for the project. Paint Spot attended meetings with Straticon regarding the Lodge Project, and Paint Spot submitted signed partial waivers of lien to M&P as a precondition to receiving payment for the paint materials. Straticon would not pay M&P without M&P submitting partial waivers from its suppliers.

Paint Spot continued supplying materials to the Lodge Project through September of 2014, at which time M&P stopped working on the project because it was not being paid by Straticon. At the time M&P left the Lodge Project, $32,535.87 worth of paint and supplies delivered by Paint Spot, which had not been paid for, remained at the Lodge Project. Trump used those materials to finish

the painting work, but Paint Spot was never paid for those items, resulting in the instant action to foreclose the lien.

After a non-jury trial, the trial court determined, *inter alia*, that (1) Trump and Straticon had actual knowledge of Paint Spot's NTO; (2) Trump and Straticon had actual knowledge that Paint Spot was supplying materials to Straticon (through M&P) for the Lodge Project; (3) Trump was estopped from invalidating Paint Spot's NTO because Trump caused Paint Spot to rely to its detriment on the T&G NOC; and (4) Paint Spot substantially complied with the statutory requirements of section 713.06 and therefore its NTO was valid and its lien enforceable. The trial court thereafter entered final judgment in favor of Paint Spot, and subsequently entered final judgment awarding attorney's fees to Paint Spot pursuant to section 713.29, Florida Statutes (2013). These consolidated appeals followed.

Trump asserts that strict compliance with 713.06(2)(a) was required of Paint Spot, and that the trial court erred in enforcing the lien because Paint Spot failed to strictly comply with that provision, despite having knowledge, prior to the statutory deadline, that the NTO was defective. Trump contends that neither detrimental reliance nor substantial compliance applies here to validate, or permit enforcement of, the lien.

To the extent that we are reviewing the trial court's factual determinations, our standard of review is whether there is competent, substantial evidence to

6

support the judgment. James P. Driscoll, Inc. v. Gould, 521 So. 2d 301 (Fla. 3d DCA 1988). To the extent that we are reviewing the trial court's application of the law to its factual determinations, our standard of review is de novo. Stock Bldg. Supply of Fla. Inc. v. Soares Da Costa Constr., 76 So. 3d 313, 316 (Fla 3d DCA 2011).

## ANALYSIS

### The Construction Lien Law

Chapter 713 of the Florida Statutes, entitled "Construction Lien Law," establishes a statutory framework for establishment and enforcement of construction liens by subcontractors, laborers and materialmen. "[T]he fundamental purpose of the Construction Lien Law is to protect those who have provided labor and materials for the improvement of real property." WMS Constr., Inc. v. Palm Springs Mile Assoc., Ltd., 762 So. 2d 973, 974-75 (Fla. 3d DCA 2000). "It is to be construed favorably so as to give laborers and suppliers the greatest protection compatible with justice and equity." Id. at 975. "The mechanics lien law was enacted to protect the interests of subcontractors and materialmen who remain unpaid while the owner pays the contractor directly." Hardrives Co. v. Tri-County Concrete Prods., Inc., 489 So. 2d 1211, 1212 (Fla. 4th DCA 1986).

7

For our purposes, the relevant provisions are found in section 713.06, Florida Statutes (2013).

Section 713.06(1) provides:

A materialman or laborer, either of whom is not in privity with the owner, or a subcontractor or sub-subcontractor who complies with the provisions of this part and is subject to the limitations thereof, has a lien on the real property improved for any money that is owed to him or her for labor, services, or materials furnished in accordance with his or her contract and with the direct contract and for any unpaid finance charges due under the lienor's contract.

Section 713.06(2)(a) provides:

All lienors under this section, except laborers, as a prerequisite to perfecting a lien under this chapter and recording a claim of lien, must serve a notice on the owner setting forth the lienor's name and address, a description sufficient for identification of the real property, and the nature of the services or materials furnished or to be furnished. A sub-subcontractor or a materialman to a subcontractor must serve a copy of the notice on the contractor as a prerequisite to perfecting a lien under this chapter and recording a claim of lien. A materialman to a sub-subcontractor must serve a copy of the notice to owner on the contractor as a prerequisite to perfecting a lien under this chapter and recording a claim of lien. A materialman to a sub-subcontractor shall serve the notice to owner on the subcontractor if the materialman knows the name and address of the subcontractor. The notice must be served before commencing, or not later than 45 days after commencing, to furnish his or her labor, services, or materials, but, in any event, before the date of the owner's disbursement of the final payment after the contractor has furnished the affidavit under subparagraph (3)(d)1. The notice must be served regardless of the method of payments by the owner, whether proper or improper, and does not give to the lienor serving the notice any priority over other lienors in the same category; and the failure to serve the notice, or to timely serve it, is a complete defense to enforcement of a lien by any person. The serving of the notice does not dispense with recording the claim of lien. The notice is not a lien,

cloud, or encumbrance on the real property nor actual or constructive notice of any of them.

(Emphasis added.)

Section 713.06(2)(b) provides:

If the owner, in his or her notice of commencement, has designated a person in addition to himself or herself to receive a copy of such lienor's notice, as provided in s. 713.13(1)(b), the lienor shall serve a copy of his or her notice on the person so designated. The failure by the lienor to serve such copy, however, does not invalidate an otherwise valid lien.

Finally, under section 713.06(2)(f):

If a lienor has substantially complied with the provisions of paragraphs (a), (b), and (c), errors and omissions do not prevent the enforcement of a claim against a person who has not been adversely affected by such omission or error. However, a lienor must strictly comply with the time requirements of paragraph (a).

There is no dispute that Paint Spot timely served the NTO on Trump (as well as T&G and M&P). There is also no dispute that the NTO was substantially in the form provided by section 713.06(2)(c), with one exception: the name of the contractor was listed as T&G instead of Straticon.

And while the notice was not directly served by Paint Spot upon Straticon, the evidence at trial established that: Straticon actually received the NTO in a timely manner; Straticon was on actual notice that Paint Spot was supplying materials to the Lodge Project under an order given by M&P; and that Straticon and Trump knew from the NTO that Trump was required to obtain lien waivers

9

from Paint Spot in order to avoid paying twice for materials provided by Paint Spot.

Detrimental Reliance

Further, although "mechanic's lien statutes are to be strictly construed . . . good faith reasonable substantial compliance has been recognized as effective in cases where material acts or omissions by the owner have caused circumstances of detrimental reliance." Roof Structures, Inc. v. Picou, 544 So. 2d 1138 (Fla. 4th DCA 1989). It is clear that until November 21, Paint Spot did in fact rely, to its detriment, upon the wrong NOC it received from Trump. But on that date, when Paint Spot received the email from Bravo regarding this error, Paint Spot was no longer relying to its detriment on the incorrect information supplied by Trump. Instead, Paint Spot failed to take steps to remedy this defect after being placed on notice of the defect. Therefore, Trump is correct in its contention that the detrimental reliance doctrine does not apply in this case. Compare Picou, 544 So. 2d at 1139 (holding lien valid despite subcontractor naming wrong contractor in NTO because the owner failed to file a NOC identifying the correct contractor, and this material omission caused the subcontractor to detrimentally rely upon erroneous building department records.) See also, Suchman v. Nat'l Hauling, Inc., 549 So. 2d 200 (Fla. 3d DCA 1989) (holding NTO was valid, despite failure to

10

deliver a copy of the NTO to the general contractor, because owner failed to file a NOC identifying that general contractor).

<u>Substantial Compliance</u>

Nevertheless, the absence of detrimental reliance by Paint Spot does not end our analysis. A plain reading of the applicable statute evidences that if Paint Spot has "substantially complied" with section 713.06(2)(a),[6] (b)[7] and (c), "errors and omissions do not prevent the enforcement of a claim against a person who has not been adversely affected by such omission or error." § 713.06(2)(f), Fla. Stat. (2013).

Subsection (a) requires the lienor to, within 45 days after commencing to furnish labor, services, or materials, serve the NTO "on the owner setting forth the lienor's name and address, a description sufficient for identification of the real

---

[6] Section 713.06(2)(f) deems "substantial compliance" sufficient, with one exception: "a lienor must strictly comply with the <u>time</u> requirements" of subsection (2)(a), which mandates that the NTO be served within forty-five days after commencing to furnish labor, services or materials. Trump contends that Paint Spot failed to strictly comply with this time requirement because it did not *serve Straticon* within forty-five days of commencement. However, subsection (2)(f) speaks to strict compliance with the *time* requirements, not with the *service* requirement. This time requirement was met when Paint Spot served its NTO on Trump within 45 days of commencement. We further hold that there was substantial compliance with the service requirement; although Paint Spot did not serve Straticon, it is undisputed that Straticon actually received and reviewed the NTO within the requisite 45-day period. <u>See</u> <u>Suchman</u>, 549 So. 2d at 202, note 5 (holding that actual notice is sufficient to satisfy the requirements of the statute).

[7] Paint Spot's compliance with subsection (b) is not in dispute, and thus a discussion of that subsection's application to this case is unnecessary.

11

property, and the nature of the services or materials furnished or to be furnished." It also requires the lienor, if a subcontractor or materialman, to serve the NTO on the contractor within that same 45-day time period. Paint Spot complied with these requirements, but served it on T&G instead of Straticon. As to subsection (c), Paint Spot's NTO was in compliance with the form requirements, again with the exception of designating the incorrect name of the contractor. Thus, we must assess whether the trial court properly determined that Paint Spot's NTO "substantially complied" with subsections (a) and (c) and, if so, whether Trump established it was adversely affected by the error.

In Symons Corp. v. Tartan-Lavers Delray Beach, Inc., 456 So. 2d 1254 (Fla. 4th DCA 1984), Symons Corp., a subcontractor, mistakenly listed an incorrect name as the owner of the property. Instead of Tartan-Lavers Delray Beach, Inc., the NTO identified the owner as Lavers Delray Racquet Club. The Fourth District acknowledged that the names were different, but pointed out that "if the owner, or others, were not misled, prejudiced or injured by the claimed defect in the Notice, especially in the case of an honest mistake, the lien is not vitiated by such defect." Id. at 1259. The Fourth District held that the lien was valid, and that the owner could not have been misled by this error because the owner responded to the claim of lien by bonding off the lien against the property.

In the instant case, Trump and Straticon had actual, express and timely notice that: Paint Spot mistakenly named the wrong contractor in its NTO; M&P (whose name was properly listed in the NTO) was Straticon's own subcontractor for the Lodge Project; Paint Spot was supplying materials to the Lodge Project under M&P; and Paint Spot intended to lien the property if payment was not timely made.

Further, the evidence established that Straticon treated Paint Spot as a potential lienor for the duration of the Lodge Project. For example, Paint Spot attended meetings with Straticon on the Lodge Project, and Straticon received partial lien waivers from M&P, which included partial lien waivers from Paint Spot for materials provided for the Lodge Project. Several partial payments were made to Paint Spot for materials supplied for the Lodge Project. Straticon even attempted to assist Paint Spot in obtaining payment from Trump for the remaining Paint Spot materials left at the Lodge Project, which materials were later used to complete M&P's work.

We addressed a similar error in Centex-Winston Corp. v. Crown Paint, Inc., 294 So. 2d 694 (Fla. 3d DCA 1974). In that case, instead of the actual contractor (Arcus Dry Wall) being identified in the notice to owner, Crown Paint listed the contractor as "Sen Tex-Winston Corp." (i.e., the owner and developer of the project, though incorrectly spelled). Notwithstanding this error, we affirmed the

13

final judgment and held that the lien was properly found valid, because Centex-Winston "failed to make a sufficient showing that it was adversely affected by the error on the notice to owner." Id. at 695. Here too, Trump has failed to carry its burden of demonstrating that it was adversely affected by Paint Spot's erroneous listing of T&G as the contractor. Notably, there is no evidence that, as a result of this error, Trump paid T&G for the paint supplies, and was thus at risk of paying twice for the same materials. Rather, the evidence at trial established that the painting subcontractor (who replaced M&P when it left the job) used Paint Spot's materials to finish the Lodge Project, and that Paint Spot was not fully paid for those materials. At trial, Jamie Gram (Straticon's project manager) admitted the reason for not paying Paint Spot the amounts due:

> [T]he decision not to pay [Paint Spot] had nothing to do with a defective Notice to Owner . . . . They weren't paid because Mr. Trump had already paid M&P a decent amount of money of the contract . . . and there was still a lot of work that needed to be completed, so we used the money, M&P's remaining balance, plus additional funds to pay to get the work done.

"The purpose of the [NTO] is to protect an owner from the possibility of paying over to his contractor sums which ought to go to a subcontractor who remains unpaid." Stock Bldg. Supply, 76 So. 3d at 319 (quoting Bishop v. James A. Knowles, Inc., 292 So. 2d 415, 417 (Fla. 2d DCA 1974)).

**CONCLUSION**

14

Accordingly, we hold that the trial court correctly determined that Paint Spot substantially complied with the provisions of section 713.06(2)(a), (b), and (c), and that Paint Spot strictly complied with the time requirements of subsection (2)(a). We further hold that that Trump failed to establish that it was adversely affected by the error contained in the NTO. We also affirm the final judgment awarding attorney's fees.

Affirmed.