[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10987
_____

D.C. Docket No. 1:14-cv-20893-UU


CLIFFORD A. ZUCKER,
not individually, but as Plan Administrator for
BankUnited Financial Corporation, and as
assignee of Humberto L. Lopez and Ramiro A. Ortiz,

Plaintiff-Appellant,

versus

U.S. SPECIALTY INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 16, 2017)

Before ED CARNES, Chief Judge, FAY and PARKER,[*] Circuit Judges.

_____

[*] Honorable Barrington D. Parker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

ED CARNES, Chief Judge:

For want of good corporate officers, BankUnited Financial Corporation engaged in risky lending practices before November 2008.  For want of good lending practices, BankUnited became insolvent.  For want of solvency, BankUnited's transfers of money to its subsidiary were fraudulent.

Wanting their money back, BankUnited's creditors sued its officers for authorizing those transfers.  Wanting protection from the resulting liability, the officers asked their insurer — U.S. Specialty — to indemnify them.  Not wanting to do that, U.S. Specialty refused based in part on a policy exclusion that barred coverage for claims "arising out of" conduct that occurred before November 2008. The question is whether the fraudulent transfers "arose out of" the officers' pre-November 2008 misconduct.

## I. FACTS & PROCEDURAL HISTORY

BankUnited (the Parent Bank) was a holding company headquartered in Florida.  Its wholly-owned subsidiary, BankUnited FSB (the Subsidiary Bank), was a federally-chartered savings bank.  By November 2008 both of them were in serious financial trouble.[1]

## A. The Banks' Fiscal Difficulties

---

[1] "We relate the facts — as we must at this stage of the litigation — in the light most favorable to" the plaintiff.  Goodman v. Kimbrough, 718 F.3d 1325, 1329 (11th Cir. 2013).

The Treasury Department's Office of Thrift Supervision (OTS) began investigating the Subsidiary Bank in January 2008. By August, news reports were circulating that the Subsidiary Bank had engaged in risky lending practices during the housing boom that preceded the 2008 recession. The Parent Bank reported in a regulatory filing that, unless the Subsidiary Bank raised $400 million, OTS would downgrade its capitalization rating. The Parent Bank also announced that it was contributing $80 million in fresh capital to the Subsidiary Bank. This left the Parent Bank itself with only $40 million dollars to service $125 million in debt, not a good situation for any financial institution to be in.

In September 2008 the Parent Bank's investors filed a class action against several corporate officers of the Parent Bank and the Subsidiary Bank, alleging that those officers had violated federal securities laws by knowingly or recklessly making "false and misleading statements about [the Parent Bank]." The investor plaintiffs based their allegations on, among other things, the Parent Bank's regulatory filings from 2006, which touted its "conservative underwriting standards that include evaluation of a borrower's debt service ability" and internal underwriting process. They also pointed to a 2007 filing by the Parent Bank that boldly asserted: "We expect that our historically conservative credit standards and relatively low loan to values will keep our loss experience well below industry averages." Even more boldly, the Parent Bank issued an April 2007 press release

that included this statement by the company's CEO, Alfred Camner:  "[O]ur levels came in better than we projected last quarter.  This is because of our conservative underwriting.  We do not engage in subprime lending and, as a portfolio lender, we treat each loan as if it is our own."  And so on.

As it turned out (we are beyond mere allegations now), the Subsidiary Bank did engage in risky lending practices.  Around the same time that the Parent Bank was being sued by its shareholders, the banks entered into agreements with OTS stipulating in September 2008 that they had "engaged in unsafe and unsound practices that . . . resulted in [the Subsidiary Bank] being in an unsatisfactory condition."  This was "primarily due to the rising delinquencies and defaults in its payment option [Adjustable Rate Mortgage] loan portfolio."

**B. The Parent Bank's Search for a New Insurer**

By September 2008 St. Paul Mercury Insurance Company (Travelers) had declined to renew the Parent Bank's directors and officers (D&O) insurance policy, which is not surprising given the banks' fiscal difficulties.  The Parent Bank began searching for a new insurer.

It found one in U.S. Specialty.[2]  At the time, U.S. Specialty was aware that

---

[2] The Parent Bank actually obtained the insurance through a broker's negotiations with HCC Global Financial Products.  Both U.S. Specialty and HCC Global are subsidiaries of HCC Insurance Holdings.  HCC Global underwrites policies for a number of insurance companies that are subsidiaries of HCC Insurance, including U.S. Specialty.  For simplicity's sake, and because this corporate structure has no bearing on the outcome of this case, we will refer to all of these entities collectively as "U.S. Specialty."

"[b]ad loans were affecting [the banks'] financial performance," and that they were in a "distressed financial condition." It was also aware that OTS was threatening to downgrade the Subsidiary Bank's capitalization rating unless the Parent Bank raised $400 million. All of which made issuing a D&O policy covering the Parent Bank's officers a risky proposition.

Margaret Kingsley, an underwriter and U.S. Specialty's designee under Rule 30(b)(6) of the Federal Rules of Civil Procedure, testified at her deposition that around the time the policy was issued, she thought it was unlikely that the Parent Bank would survive. She noted in the underwriting file that U.S. Specialty might be able to make an "opportunistic play" if it agreed to provide D&O coverage to the Parent Bank. Kingsley later testified that note in the file meant that insuring the Parent Bank was "an opportunity for [U.S. Specialty] to write a very restrictive policy and get some premium for it." In considering whether to issue a D&O policy to the Parent Bank, U.S. Specialty also considered that regulators would be watching the banks closely, which would "keep[ ] them honest."

U.S. Specialty offered the Parent Bank a choice between two policies: one with a Prior Acts Exclusion (barring coverage for losses attributable to conduct of the officers before November 10, 2008) and one without that exclusion. The policy with the exclusion would cost $350,000; the policy without it would cost $650,000. The policy without the Prior Acts Exclusion would provide coverage

5

only after the Parent Bank's other insurance policies had been exhausted.

The Parent Bank decided to purchase the policy with the Prior Acts Exclusion, but asked U.S. Specialty to increase the coverage limit from $10 million to $20 million. The purchased policy included in addition to the Prior Acts Exclusion a Prior Notice Exclusion, which excluded coverage as to any losses reported to any insurers under earlier insurance policies. With those two exclusions, the one-year policy cost the Parent Bank $700,000. And, at U.S. Specialty's request, the Parent Bank purchased an extension of the discovery period on the pre-existing Traveler's policy, increasing the amount of time it had to report claims to Traveler's. The first day of coverage under the U.S. Specialty policy was November 10, 2008.

## C. The Transfer of Two Tax Refunds to the Subsidiary Bank

While the Parent Bank and the Subsidiary Bank were struggling to come to terms with the 2008 financial crisis, the Parent Bank's officers approved two transfers of money to the Subsidiary Bank that are the subject of this lawsuit. In January 2009 the Parent Bank received a tax refund check from the U.S. Treasury for approximately $20 million. It transferred all of that refund to the Subsidiary Bank. In March 2009 an officer of the Parent Bank directed that a second tax refund check from the Treasury for approximately $26 million that was supposed to be issued to the Parent Bank be wired directly to the Subsidiary Bank. Those

6

$46 million in transfers occurred after November 10, 2008 (the inception date for the U.S. Specialty policy).

## D. The Bankruptcy Litigation

The Parent Bank's and the Subsidiary Bank's financial conditions did not improve. And in May 2009 OTS closed the Subsidiary Bank and appointed the FDIC as its receiver. One day later, the Parent Bank filed for bankruptcy under Chapter 11 of the Bankruptcy Code. And a few days after that, an official committee of unsecured creditors (the Committee) was appointed in the bankruptcy action and began investigating whether claims might exist against, among others, the Parent Bank's corporate officers — the idea being that those claims could be pursued for the benefit of the bankruptcy estate.

The Committee filed a derivative standing motion, seeking "an order granting the Committee standing to investigate, assert and prosecute any and all claims that [the Parent Bank might have] against [its] current and former officers and directors . . . ."[3] The motion asserted that:

> Based on [the Parent Bank's] financial collapse, the issues raised in the [September 2008] Securities Litigation, and information obtained by its professionals, the Committee believes that Claims on behalf of [the Parent Bank's bankruptcy estate] may exist against certain of [its] current and former officers and directors . . . including without limitation Claims arising from breaches of duties owed by [those insiders] to [the Parent Bank] or [its] constituents, misrepresentations,

---

[3] Besides the Parent Bank, there were two other debtors in the bankruptcy action, but that fact is not relevant to our decision.

failures to disclose and other wrongful acts . . . .

The bankruptcy court granted the Committee's derivative standing motion.

In November 2009, the Committee sent demand letters to three former Parent Bank executives — Alfred Camner, Ramiro Ortiz, and Humberto Lopez — stating that it believed the Parent Bank's estate had claims against the three of them, "including without limitation claims arising from the breach of [their] fiduciary duties of care and loyalty . . . and [their] failure to perform [their] duties . . . in good faith" and from their violations of federal securities laws. U.S. Specialty was notified of those claims and issued a letter denying coverage based on the Prior Acts Exclusion, because the "Committee Demand Letters allege numerous Wrongful Acts occurring prior to November 10, 2008."

In December 2011, the Committee filed an adversary proceeding against Camner and Lopez in the bankruptcy court. It later sought to amend the complaint by substituting Ortiz for Camner as a defendant as to one count. Meanwhile, in June 2012, the bankruptcy court substituted Clifford Zucker, who had been appointed as the bankruptcy Plan Administrator, for the Committee as the plaintiff in the bankruptcy action. After the district court granted Zucker leave to do so, he filed an amended complaint against Camner, Lopez, and Ortiz.

The amended complaint had four counts. Count I sought to recover from Lopez and Camner for breaching their fiduciary duties by "fail[ing] to implement

and maintain effective risk management procedures and internal controls," which caused the Subsidiary Bank to be placed into receivership and the Parent Bank to declare bankruptcy. Count II sought to recover from Lopez and Camner for breaching their fiduciary duties by providing inaccurate and incomplete information to the Parent Bank's board of directors "concerning the lack of internal controls and unreasonably risky lending practices," which Zucker alleged caused the board to authorize expenditures and the issuance of debt and artificially prolonged the existence of the company, causing more losses. Count III sought to recover from Camner alone for causing the Parent Bank's board to approve the infusion of $80 million into the Subsidiary Bank without "investigating whether, or disclosing to [the Parent Bank's] board that, among other things, the capital infusion would not forestall regulatory seizure of the [Subsidiary Bank]." And Count IV sought to recover from Ortiz and Lopez based on the contention that approving the two tax refund transfers to the Subsidiary Bank in 2009 was a breach of their fiduciary duties because the transfers violated Florida's Uniform Fraudulent Transfers Act. The fraudulent transfer claims (Count IV) based on the 2009 tax refund transfers are the primary focus of this lawsuit.

In November 2012, Bankruptcy Plan Administrator Zucker sent a written settlement demand to Lopez and Oritz concerning the fraudulent transfer claims (Count IV). That demand was forwarded to U.S. Specialty, which again denied

9

coverage.

Eventually, the fraudulent transfer claims settled for $15 million to be paid either by U.S. Specialty or by Lopez and Ortiz individually.  The settlement agreement assigned Lopez's and Ortiz's rights under the U.S. Specialty policy to Zucker.  The other claims were settled separately.

## E. The Lawsuit against U.S. Specialty

After Zucker settled his fraudulent transfer claims against the banks' corporate officers in the bankruptcy action, he filed this lawsuit in the district court against U.S. Specialty based on its denial of coverage as to those claims.  In the complaint, he asserted claims for breach of contract, statutory bad faith, and common law bad faith.  The district court bifurcated the proceedings so that it could decide whether denying coverage of the fraudulent transfer claims amounted to a breach of contract before considering whether U.S. Specialty acted in bad faith.  The parties filed cross-motions for summary judgment, disagreeing primarily over whether the fraudulent transfer claims were covered by the U.S. Specialty policy.

The district court concluded that the Prior Acts Exclusion did bar coverage for the fraudulent transfer claims, and as a result, U.S. Specialty did not breach the insurance contract.  On that basis it granted summary judgment in favor of U.S. Specialty.  Because that decision also foreclosed Zucker's bad faith claims, the

district court entered a final judgment against Zucker.  This is his appeal.

## II. ANALYSIS

We review de novo the district court's interpretation of the insurance policy and its grant of summary judgment in favor of U.S. Specialty.  See EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am., 845 F.3d 1099, 1105 (11th Cir. 2017).  In so doing, "we view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  Procaps S.A. v. Patheon, Inc., 845 F.3d 1072, 1079 (11th Cir. 2016) (quotation marks omitted).

The parties agree that Florida law applies to this case.  "Under Florida law, insurance contracts are construed according to their plain meaning."  Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005). "Ambiguities are construed against the insurer and in favor of coverage[,] . . . . [but] to allow for such a construction the provision must actually be ambiguous." [4] Id.  While "insurance policies may be confusing to persons not trained or experienced in the form and language of insurance policies[,] . . . . that fact does not make such policies or language legally ambiguous."  Fla. Ins. Guar. Ass'n v. Sechler, 478 So. 2d 365, 367 (Fla. 5th DCA 1985).  "[C]ourts may not rewrite

---

[4] U.S. Specialty contends that this rule of construction should not apply here because this was an insurance agreement between sophisticated parties.  Because we conclude that the policy here was not ambiguous, we need not address that contention.

contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Taurus Holdings, Inc., 913 So. 2d at 532 (quotation marks omitted).

Zucker contends that the district court erred when it concluded that the fraudulent transfer claims in the bankruptcy complaint fell within the Prior Acts Exclusion in the U.S. Specialty policy. We disagree with him and agree with the district court.

## A. Zucker's Claims Fall within the Prior Acts Exclusion

Zucker's claims against Lopez and Ortiz alleged that approving the 2009 tax refund transfers was a breach of their fiduciary duties because those transfers were fraudulent ones under Florida law.[5] He alleged that they were fraudulent transfers because they "were made to the [Subsidiary Bank], an insider, for antecedent debt, . . . at a time when [the Parent Bank] was insolvent . . . . [and] the persons in control of [the Subsidiary Bank] had reasonable cause to believe [the Parent Bank] was insolvent."

_____

[5] Zucker has an alternative theory that, even if the district court were correct that his claim that transferring the entire $46 million in tax refunds arose out of pre-2008 conduct and was covered by the Prior Acts Exclusion, the transfer of $17.9 million of the amount did not and was not. We will not consider that alternative theory of coverage because Zucker did not adequately raise it in the district court. See Reider v. Philip Morris USA, Inc., 793 F.3d 1254, 1258 (11th Cir. 2015) ("[I]ssues raised for the first time on appeal are generally forfeited because the district court did not have the opportunity to consider them.") (quotation marks omitted); Juris v. Inamed Corp., 685 F.3d 1294, 1325 (11th Cir. 2012) ("[I]f a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it.") (quotation marks omitted).

As the district court explained:  "This allegation parrots the language of Florida's Uniform Fraudulent Transfer Act . . . ."  See Fla. Stat. § 726.106(2).  To sustain a fraudulent transfer claim under that statutory provision, a creditor must demonstrate that, among other things, the debtor was insolvent at the time of the transfer.  Id.

> The U.S. Specialty policy's Prior Acts Exclusion reads:
>
> In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any Wrongful Act committed or allegedly committed, in whole or in part, prior to [November 10, 2008].

And the policy defines a "wrongful act" as any:

> (1) actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:
>
>> (a) by an Insured Person in his or her capacity as such, including in an Outside Capacity, or
>>
>> (b) with respect only to Securities Claims, by the Company; or
>
> (2) matter claimed against an Insured Person solely by reason of his or her service in such capacity or in an Outside Capacity.

Zucker argues that because the tax refund transfers that form the basis of the fraudulent transfer claims occurred in 2009 and insolvency itself is not a wrongful act, those claims should not fall within the Prior Acts Exclusion of the policy.[6]

---

[6] Zucker also makes much of the fact that the U.S. Specialty underwriter changed the title of the Prior Acts Exclusion on the quotes she sent to the Parent Bank from "Prior Acts Exclusion (Broad Form)" to "Prior Acts Exclusion (Policy Inception)," although the exclusion in the final policy still contained the "broad form" language.  Zucker does not explain in his briefs to us how

U.S. Specialty responds that the claims do fall within the exclusion because what made the transfers wrongful was the Parent Bank's insolvency, which resulted from its officers' pre-November 2008 misdeeds, not their post-November 2008 conduct.

"When we address issues of state law, like the ones in this case, we are bound by the decisions of the state supreme court." World Harvest Church, Inc. v. Guideone Mut. Ins. Co., 586 F.3d 950, 957 (11th Cir. 2009). The Supreme Court of Florida has concluded that the phrase "arising out of" is not ambiguous and has a broad meaning, even when used in a policy exclusion. Taurus Holdings, Inc., 913 So. 2d at 539. It "means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" Id. While that standard "requires more than a mere coincidence between the conduct . . . and the injury[,] . . . . it does not require proximate caus[ation]." Id. at 539–40.

Decisions of the Florida Supreme Court, the Florida Courts of Appeal, and this Court show that the "arising out of" standard is not difficult to meet. For instance, in Hernandez v. Protective Casualty Insurance Co., 473 So. 2d 1241, 1242–43 (Fla. 1985), the court concluded that a driver's injuries did "aris[e] out of the ownership, maintenance or use of a motor vehicle" where he was injured by the

---

that change in the title could modify or clarify the meaning of the exclusion or mislead an insured. We are not persuaded that it could or did.

14

police as they arrested him for a traffic violation.  The Florida Supreme Court

explained:

> It was the manner of petitioner's use of his vehicle which prompted the actions causing his injury.  While the force exercised by the police may have been the direct cause of injury, under the circumstances of this case it was not such an intervening event so as to break the link between petitioner's use of the vehicle and his resultant injury.

Id. at 1243.[7]

Likewise, in Acosta, Inc. v. National Union Fire Insurance Co., 39 So. 3d

565, 576–77 (Fla. 1st DCA 2010), the Florida First District Court of Appeal

concluded that a lawsuit "arose out of" an earlier lawsuit and thus fell within a

prior litigation exclusion.[8]  The court explained that the later lawsuit "ha[d] a

connection with" the earlier one because "all of the counts asserted against" the

defendant in both the earlier and later lawsuits "center[ed] on its efforts to obtain

contracts with [the plaintiffs'] clients."  Id.  Although the two lawsuits focused on

different conduct, they shared a connection because the defendant's conduct giving

rise to each lawsuit was part of the same "overall scheme."  Id.  And we have

applied the Florida Supreme Court's definition of "arising out of" from Taurus

---

[7] Though Hernandez predates the Florida Supreme Court's effort in Taurus Holdings to define "arising out of," its decision in that case cited Hernandez — as well as several other older cases discussing the meaning of "arising out of" — approvingly.  Taurus Holdings, Inc., 913 So. 2d at 533–34.

[8] "Federal courts sitting in diversity are bound to adhere to decisions of [Florida's] intermediate appellate courts, absent some persuasive indication that the state's highest court would decide the issue otherwise."  Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1025 (11th Cir. 2014) (quotation marks omitted) (alteration in original).

Holdings in a similar fashion.  James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1276–77 (11th Cir. 2008) (holding that a claim "arose out of" pollution, and therefore was covered by a pollution exclusion, where a negligent environmental site assessment that failed to detect the presence of pollution on the property led to lost profits, lost property value, and the need for environmental remediation).[9]

In light of the Florida courts' broad interpretation of the "arising out of" standard, we conclude that the Parent Bank's insolvency "arose out of" wrongful acts that occurred before November 10, 2008.  After all, Zucker's complaint in the bankruptcy case alleged that the Parent Bank's corporate officers committed wrongful acts, some of which occurred before November 2008, that harmed the company financially.  So Zucker has admitted that the wrongful conduct of the corporate officers contributed to the insolvency that made the 2009 tax refund transfers fraudulent under Florida law.  And while Zucker is right to say that insolvency itself is not an inherently wrongful act, what matters here is that an essential element of  his  claim — the Parent Bank's insolvency — has a connection to some prior wrongful acts of the Parent Bank's officers and directors

---

[9] Our prior panel precedent rule requires us to follow a prior panel's binding interpretation of state law unless and until the state supreme court or a state intermediate appellate court issues a decision suggesting that our interpretation of state law was incorrect. EmbroidMe.com, Inc., 845 F.3d at 1105; Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1450–51 (11th Cir. 1991).  That has not happened in this instance.

16

that occurred before the policy's effective date.  Given that, Zucker's fraudulent transfer claims do share "a connection with" wrongful acts covered by the Prior Acts Exclusion.  Taurus Holdings, Inc., 913 So. 2d at 539.

Zucker attempts to get around that connection by emphasizing that he didn't incorporate the paragraphs describing the officers' misconduct into Count IV (the fraudulent transfer count) of his complaint.  True, but irrelevant.  The Parent Bank's insolvency is an element of his claim and that insolvency has a connection to misdeeds and misdealing of the Parent Bank's officers before November 2008.

Zucker also points out that he would not have had to prove that the officers engaged in misconduct in order to prevail on his fraudulent transfer claim.  That does not, however, mean there was no causal connection between the officers' deeds and the demise of the Parent Bank.  "[C]overage — and the accompanying duty to indemnify — is not determined by reference to the claimant's complaint, but rather by reference to the actual facts and circumstances of the injury."  Mid-Continent Cas. Co. v. Royal Crane, LLC, 169 So. 3d 174, 181 (Fla. 4th DCA 2015) (quotation marks omitted).  Zucker cannot plead himself around reality.

This is not a case where the causal connection between the prior wrongful acts and the loss was merely coincidental.  See, e.g., Race v. Nationwide Mut. Fire Ins. Co., 542 So. 2d 347, 351 (Fla. 1989) (holding that a motorist's injuries did not arise out of the use of an automobile where he was attacked primarily because a

17

fellow motorist, with whom he had collided, thought he was pulling a gun and the accident created, at most, "an atmosphere of hostility"); Martinez v. Citizens Prop. Ins. Corp.,  982 So. 2d 57, 59 (Fla. 3d DCA 2008) (holding that an injury did not arise out of the "maintenance, use, loading or unloading of motor vehicles" where the insured was hurt when a driveway collapsed while he was changing the oil on his car because "it was pure chance that the object upon the driveway at the time of its collapse happened to be a car"); Almayor v. State Farm Fire & Cas. Co., 613 So. 2d 526, 527 (Fla. 3d DCA 1993) (holding that an injury did not arise out of the "ownership, maintenance or use of [a] motor vehicle" where plaintiff was injured in an explosion caused when a cigarette ignited gasoline fumes from gas that had been siphoned from a car, because the car "was merely the coincidental and legally remote source of a component, the gasoline, which was itself harmless until acted upon by the insured's negligence").

It is no coincidence that insolvency and misconduct converged on the Parent Bank.  Instead, the misconduct was a significant contributing cause of the Parent Bank's vulnerability to the 2008 financial crisis.  For that reason, it is plain that Zucker's fraudulent conveyance claims "arose from" wrongful acts that predate November 10, 2008 and therefore fell within the scope of the Prior Acts

18

Exclusion.[10]

## B. The Policy's Terms are Unambiguous and Its Coverage is Not Illusory

Zucker's final effort to get around the Prior Acts Exclusion is his argument that if we adopt U.S. Specialty's construction of the Prior Acts Exclusion, the policy's coverage is illusory.  We don't think so.

Zucker relies primarily on Purrelli v. State Farm Fire & Casualty Co., 698 So. 2d 618, 620 (Fla. 2d DCA 1997), which held that when an exclusion or limitation to an insurance policy "swallow[s] up the insuring provision" it "creat[es] the grossest form of ambiguity."  As we mentioned earlier, when insurance policies are ambiguous, Florida courts construe them in favor of coverage.  Taurus Holdings, Inc., 913 So. 2d at 532.  So when a policy exclusion does swallow up an insuring provision, the Florida Courts conclude that the policy is ambiguous, Purrelli, 698 So. 2d at 620, and resolve that ambiguity by ignoring the exclusion, see Tire Kingdom, Inc. v. First S. Ins. Co., 573 So. 2d 885, 887 (Fla. 3d DCA 1990).  To quote Tire Kingdom, "[a]n insurance policy cannot grant [a]

---

[10] At one point in his brief, Zucker suggests that "arising out of" does not mean in this policy what the Florida Supreme Court has said it means in other policies.  He points to other exclusions in the policy that use the "arising out of" language and emphasizes that they also include relatedness terminology.  But Zucker makes this argument only in passing, provides no authority for it, and does not adequately explain why the use of relatedness terminology in other exclusions matters in this case.  As a result, he has not properly presented this argument and we do not consider it.  Sapuppo v. Allsatate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

right[ ] in one paragraph and then retract the very same right in another paragraph called an 'exclusion.'" Id.

Zucker argues that Purelli is on all fours with this case, but it is not. The insurance policy in Purrelli had a provision explicitly providing coverage for invasion of privacy (an intentional tort), but also had an exclusion precluding coverage for "intended" injuries. 698 So. 2d at 619–20. In that way the policy's exclusion expressly contradicted its coverage provisions, leaving the insured to wonder which provision correctly explained the scope of his coverage. Here, by contrast, the U.S. Specialty policy's Prior Acts Exclusion does not "grant [a] right[ ] in one paragraph and then retract the very same right" in a later one. See Tire Kingdom, Inc., 573 So. 2d at 887. Instead, it simply excludes coverage for a subset of claims that would ordinarily fall within the policy's insuring provisions. For the same reason, Tire Kingdom doesn't support Zucker's position. In that case, the policy "attempt[ed] to provide coverage for certain advertising activities and then exclude those same activities." Id. The U.S. Specialty policy doesn't do that.

This also is not a case that falls within the common law "illusory coverage" doctrine that other jurisdictions have recognized and that we have indicated is part of Florida's insurance law. See Interline Brands, Inc. v. Chartis Specialty Ins. Co., 749 F.3d 962, 966–67 (11th Cir. 2014) (applying Florida law). In order for an

20

exclusion to render a policy's coverage illusory it must eliminate all — or at least virtually all — coverage in a policy. See id. ("According to Interline, the Exclusion's broad scope reduces the coverage Chartis sold to Interline to a 'façade' . . . . Interline overstates the extent to which the Exclusion limits coverage. Even with the broad Exclusion, the policy still contains extensive coverage.") (quotation marks omitted); cf. Great Am. E & S Ins. Co. v. End Zone Pub & Grill of Narragansett, Inc., 45 A.3d 571, 576 (R.I. 2012) ("We will deem an exclusion to an insurance policy illusory only when it would preclude coverage in almost any circumstance.") (quotation marks omitted); McGregor v. Allamerica Ins. Co., 868 N.E.2d 1225, 1228 (Mass. 2007) ("As long as an insurance policy provides coverage for some acts, it is not illusory simply because it contains a broad exclusion."); Point of Rocks Ranch, LLC v. Sun Valley Title Ins. Co., 146 P.3d 677, 680 (Idaho 2006) ("An insurance policy's coverage is illusory if it appears that if any actual coverage does exist it is extremely minimal and affords no realistic protection to any group or class of injured persons.") (quotation marks omitted).

U.S. Specialty overstates the case when it says that the policy "still provides coverage for a wide variety of Claims." We need not agree with that statement. It is enough that the policy provided coverage for claims that arose exclusively from conduct that happened after the effective date of the policy. The Prior Acts

Exclusion excludes a lot of coverage, but not all coverage.  And regardless of what the result might have been had this exclusion been included in an adhesion policy issued to a layperson, it was not.  The Parent Bank entered into this insurance contract with its eyes wide open and with its wallet on its mind.  U.S. Specialty offered the Parent Bank a policy without a Prior Acts Exclusion.  After weighing that offer the bank decided to reject it, having calculated that its best interests would be served by using the money it would save by accepting the exclusion to buy an increased total coverage limit.  In hindsight, that decision did not work out well, but it was the decision of a sophisticated, fully informed party.

Zucker believes the Parent Bank did not get a good deal and wishes that it had paid a higher premium for a policy without a Prior Acts Exclusion.  But after the fact wishes are not enough to change before the fact choices.  Prior acts exclusions serve valid purposes when agreed to by consenting parties.  Cf. Interline Brands, Inc., 749 F.3d at 967 ("[E]xclusions are not necessarily harmful. Exclusions . . . allow creation of a policy that provides the insured the coverage it needs at a price it can afford.  Without such exclusions, coverage would undoubtedly be more expensive.").  The Parent Bank chose to rely on its old policies to cover claims against its officers connected to wrongful acts that occurred before November 2008.  It chose to buy the policy that it bought.  It cannot change that choice now, nor can its former corporate officers, nor can

22

Zucker.[11]

**AFFIRMED.**

---

[11] U.S. Specialty also contends alternatively that the fraudulent conveyance claims are barred by the policy's Prior Notice Exclusion. The district court rejected that contention. Because we conclude that the fraudulent conveyance claims do fall within the Prior Acts Exclusion and that the exclusion does not render the policy's coverage illusory, we need not address whether we would reach the same result based on the Prior Notice Exclusion.