**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Plaintiff-Counter Defendant-Appellee,**

v.

**Samuel BELCHER, Ruth Belcher, Helen Pluskot, Catherine Hoecherl, Individually, Defendants-Counter Claimants-Appellants,**

**Thomas James Austin, Alberto Aruj, Delphine Metcalf, Louise Constantine, Mary Katherine Worth, Patricia Curry, George Randolph, Individually, Diane Carter, Personal Representative of the Estate of Raymond Carter, Defendants-Appellants,**

**Raymond Carter, Defendant.**

**No. 17-10848**
**Non-Argument Calendar**

United States Court of Appeals, Eleventh Circuit.

(September 27, 2017)

Leland Howard Jones, Richard A. Simpson, Gary P. Seligman, Wiley Rein, LLP, Washington, DC, Julie K. Linhart, CNA Coverage Litigation Group, Tampa, FL, for Plaintiff-Appellee

· Richard B. Doyle, Jr., Nicholas J. Reising, Jr., Loughren & Doyle, PA, Ft Lauderdale, FL, James C. Blecke, The Haggard Law Firm, PA, Coral Gables, FL, for Defendants-Appellants

Before ED CARNES, Chief Judge, MARCUS, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Samuel Belcher and his codefendants developed bacterial infections as a result of Eastern Pharmacy's unsanitary method of repackaging eye medication. Eastern Pharmacy's insurer, American Casualty Co. of Reading, Pennsylvania, brought suit against the defendants to determine whether their injuries constituted one, two, or three or more "claims" under Eastern Pharmacy's insurance policy. The district court granted summary judgment to American Casualty. This is the defendants' appeal.

I.

Because we are reviewing an entry of summary judgment against the defendants, we "draw all inferences and review[ ] all evidence in the light most favorable to [them]." Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Eastern Pharmacy's policy provided $1 million in coverage for "each claim" and up to $3 million in coverage in the "aggregate." It defined "claim" as "a demand for

money or services alleging injury or damage." (Emphasis omitted). The policy also stated that "[i]f related claims are made against you, all such related claims shall be considered a single claim." (Emphasis omitted). A "related claim" was defined as "all claims arising out of a single act, error or omission or arising out of related acts, errors or omissions in the rendering of professional services." (Emphasis omitted). Finally, the term "related acts, errors or omissions" was defined as "all acts, errors or omissions in the rendering of professional services ... that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." (Emphasis omitted). American Casualty also issued an insurance policy to James Kilbride, the pharmacist in charge at Eastern Pharmacy, in which the relevant terms were identical.

During the policy period, Dr. Salomon Melgen ordered two drugs called Avastin and Lucentis and arranged for them to be delivered to Eastern Pharmacy. Both drugs are manufactured by Genentech, Inc., and both are commonly used to treat eye disorders. But before they could be used for that purpose, Eastern Pharmacy had to repackage them into single use vials.

Daoud Zayed, Eastern Pharmacy's owner, performed that repackaging under the supervision of Kilbride. Zayed's procedure for repackaging the Avastin and Lucentis was identical in all material respects. He would take vials of the medication from the refrigerator into the repackaging room. There, he would remove the vials' caps, exposing the vials to the open air. He would then fill single use syringes out of the vials and, when the syringes were ready, place them in the refrigerator. He performed that procedure while wearing nonsterile protective gear and using nonsterile equipment, including nonsterile gloves, gowns, and syringes. In addition, he repackaged the medication on top of a laminar flow hood that he never turned on.

Melgen received the Avastin and Lucentis single use syringes from Eastern Pharmacy between June 2013 and December 2013. He injected Avastin into Belcher's eyes on October 1, 2013. The other defendants received intraocular injections of Avastin or Lucentis from him on January 2, 2014. After the injections the defendants developed infections in their treated eyes, which resulted in partial or total loss of vision. Testing determined that at least two different strains of bacteria had caused the infections.

In response to reports of complications after the injections, the Food and Drug Administration and the Florida Department of Business and Professional Regulation investigated Eastern Pharmacy. They concluded that the pharmacy's procedure for repackaging Avastin and Lucentis was deficient in a number of ways. For example, the FDA pointed out that Zayed had failed to use the laminar flow hood and that the repackaging room was not adequately isolated from the common pharmacy area.

The defendants separately filed complaints or made demands against Eastern Pharmacy. Eastern Pharmacy, Kilbride, American Casualty, and the defendants then entered into a settlement agreement satisfying the defendants' claims and releasing Eastern Pharmacy and Kilbride from liability. The agreement required American Casualty to file a declaratory judgment action to determine how many "claims," as the policy used the term, it was liable for. Because the policy limited the insurance payout to $1 million for a single "claim" but up to $3 million in the aggregate, the defendants would be entitled to greater compensation if the district court ruled that the defendants' injuries

constituted two or three "claims." In accordance with the agreement, American Casualty filed the complaint in this case, alleging that the single "claim" limit of $1 million applied.

After discovery, the district court granted American Casualty's motion for summary judgment, concluding that all of the defendants' claims were "related," meaning that under the policy they all constituted a single "claim." The district court denied the defendants' motions for summary judgment.

## II.

### A.

"We review de novo the district court's interpretation of the insurance policy and its grant of summary judgment...." Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co., 856 F.3d 1343, 1348 (11th Cir. 2017). The parties agree that Florida law governs this case. "Under Florida law, insurance contracts are construed according to their plain meaning." Id. (quoting Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So.2d 528, 532 (Fla. 2005)).

The defendants contend that their claims are not "related" because there were many differences in the circumstances of their injuries. They point out that they received two different types of medication, their syringes were prepared on different dates, they received their injections on different dates, and they were infected with at least two different strains of bacteria. That line of argument misunderstands the inquiry.

The policy defined "related claim[s]" as claims "arising out of related acts, errors or omissions." (Emphasis omitted). Under Florida law, "arising out of" means " 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.' " Id. (quoting Taurus Holdings, 913 So.2d at 539). The term "requires more than mere coincidence" between the conduct and the injury, but it does not require proximate causation. Id. And the policy's definition of "related acts, errors or omissions" broadens the scope of "related claim" even further. Acts, errors, or omissions are "related" under the policy if they are "logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." (Emphasis added).

Accordingly, the question is not whether there are any differences between the defendants' individual claims. Instead, we must determine whether the claims are logically or causally connected by "any" common fact, circumstance, etc. If they are, the plain meaning of the insurance policy requires that all the claims be considered a single "claim" for purposes of determining the applicable liability limit.

In this case the syringes were all prepared in the same place, a room that was not adequately separated from the common pharmacy area during the entire period that the medication was repackaged. They were prepared by a single person, Zayed, who was supervised by a single person, Kilbride. Zayed used the same process to prepare all the syringes, repeating the same violations of health and safety regulations, such as failing to turn on the laminar flow hood, every time. The syringes were all prepared for the same purpose—to be sent to Dr. Melgen to be used in treating eye problems. Cf. Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1264 (11th Cir. 2000) (applying Florida law and holding that the acts at issue were "related" under the terms of the insurance policy because "all were aimed at a single particular goal").

In light of the myriad shared facts, circumstances, and decisions that logically connect the defendants' claims, it is clear that their claims arose out of "related acts, errors or omissions." And because they arose out of "related acts, errors or omissions," the policy requires that all of the defendants' claims be considered "related claims." As a result, we agree with the district court that the $1 million single "claim" limit applies.

### B.

In the alternative, the defendants contend that if the "related claims" clause is as broad as the district court found it to be, the aggregate limit is "illusory." Florida law recognizes two ways in which a term in an insurance policy can be illusory. See Zucker, 856 F.3d at 1352–53. First, when a policy exclusion or limitation "swallow[s] up an insuring provision, the Florida [c]ourts conclude that the policy is ambiguous, and resolve that ambiguity by ignoring" the exclusion or limitation. Id. at 1352 (citations omitted); see also Tire Kingdom, Inc. v. First S. Ins. Co., 573 So.2d 885, 887 (Fla. 3d DCA 1990) ("An insurance policy cannot grant [a] right[ ] in one paragraph and then retract the very same right in another paragraph called an 'exclusion.' "). For example, in the Florida District Court of Appeal case Purrelli v. State Farm Fire & Casualty Co., 698 So.2d 618 (Fla. 2d DCA 1997), the policy purported to provide coverage for "specified intentional torts," but also excluded coverage for "intended acts." Id. at 619. The court refused to apply the intended acts exclusion because it contradicted the explicit grant of coverage of some intentional torts. See id. at 621.

That rule means that if the "related claims" definition were so broad that the aggregate limit could literally never be invoked, the right to collect up to the aggregate limit would be illusory. See Zucker, 856 F.3d at 1352. In that case, Florida courts would likely "ignore" the single "claim" limit. See id. But that is not the case here because there are situations in which the aggregate limit in this policy would be implicated. For example, the policy covers "personal injury" claims. And a claim based on a slip and fall in the pharmacy retail area would virtually always be unrelated to a claim arising from the repackaging of eye medication in the pharmacy's backroom, even under the broad "related claims" provision. Another example is if a pharmacist negligently fills a prescription with a much stronger dosage of a drug than the doctor ordered, or with the wrong drug entirely. That would be covered under the policy but it would not be related to the repackaging of eye medication under unsanitary conditions. As a result, the aggregate limit does not fall within the first category of illusory coverage. See id.

The second type of illusory coverage is where an exclusion "eliminate[s] all—or at least virtually all—coverage in a policy." Id. The policy in this case does not fall within that category either. Even if the aggregate limit could never be implicated, parties making claims against the policy would still be entitled to recover up to the $1 million single "claim" limit. The policy does not, therefore, eliminate all or virtually all coverage. The aggregate limit is not illusory.

**AFFIRMED.**